## IN RE ISAIAH J. ET AL.*

Superior Court, Judicial District of New London,
Juvenile Matters at Waterford

* Thus entitled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 32a-7.

Memorandum filed November 10, 2011[1]

*Proceedings*

*Susan B. Carr*, for the maternal grandmother.

*Christopher L. Aker*, assistant attorney general, for the petitioner.

HON. MICHAEL A. MACK, JUDGE TRIAL REFEREE.

## I
## PROCEDURAL HISTORY

On December 3, 2008, the Commissioner of the Department of Children and Families (hereinafter Petitioner or DCF or Department) filed neglect petitions alleging that the children, Isaiah J., born October 27, 2004, Aniah J. and Keanah J., both born December 1, 2005, and Tatiannah D., born April 18, 2008, being children born to Megan J. and Carlos D. (hereinafter the children unless specifically named), were being denied proper care and attention, physically, educationally, emotionally or morally and the children were being permitted to live under conditions, circumstances or associations injurious to well-being. On December 8, 2008, DCF filed a motion for order of temporary custody (OTC) for the children which was granted and subsequently sustained on December 12, 2008, and temporary custody was awarded to maternal aunt Ashley C. Also,

---

[1] Affirmed. *In re Isaiah J.*, 141 Conn. App. 474, 62 A.3d 635 (2013).

Katherine D., maternal grandmother (hereinafter Katherine or MGM), was cited in as a party, since she had been appointed temporary guardian of the minor children in New London Regional Probate Court on October 16, 2008. The children, however, were living with mother at various locations prior to December 8, 2008. On February 13, 2009, mother filed a motion to transfer guardianship to maternal grandmother and the matter was set down for trial. On March 27, 2009, DCF filed an OTC because maternal aunt could no longer care for the children as she was moving to Georgia and could not take the four children with her. The OTC was granted and the matter was set down for trial on April 9, 2009. At a trial management conference on March 30, 2009, the parties agreed to sustain the OTC and the trial date was marked off. The children went from Ashley C.'s temporary custody into the care of DCF where placement was made with a nonrelative foster care giver and where they have remained to this date. The case was set down for a judicial pretrial on May 14, 2009, and trial dates were set for early June, 2009. On May 22, 2009, mother filed a motion to vacate the OTC, which was subsequently marked off. On June 1, 2009, the first day of the neglect trial, the parties entered an agreement in court. Mother entered a plea of nolo contendere and father stood silent. The children were adjudicated neglected and committed to the care and custody of the Department of Children and Families. On January 19, 2010, DCF filed a motion to review permanency plan calling for termination of parental rights and adoption. The matter was set down for trial in late March. On February 9, 2010, maternal grandmother filed a motion to transfer guardianship to herself pursuant to General Statutes § 46b-129 (j), which is the subject of this memorandum of decision. On May 5, 2010, mother also filed a motion to transfer guardianship to Ashley C., the maternal aunt now in Georgia. On May 13,

2010, DCF filed the petition for termination of parental rights. A motion by DCF to consolidate the trial on that petition with the trial on the instant motion was denied.

On May 14, 2010, the third day of trial concerning the permanency plan, mother withdrew her objection to that permanency plan; the court approved the permanency plan of termination of parental rights and adoption and found that DCF made reasonable efforts to effectuate the permanency plan. Also on this date, mother's motion for expedited interstate compact for Georgia, filed on May 5, 2010, was granted. At the case status conference on July 6, 2010, trial dates were set to hear both mother's and maternal grandmother's motions for transfer of guardianship. On October 27, 2010, maternal grandmother filed an addendum to her motion to transfer guardianship seeking a dispositional order of a transfer of guardianship with three months of protective supervision. On November 1, 2010, the first day of trial, mother marked off her motion to transfer to guardianship. Therefore, this memorandum will only address maternal grandmother's motion to transfer guardianship. The children have been in the care of DCF since December 8, 2008. The case was tried to the court on November 1, 4, 29, 2010; January 10, 2011; February 10, 14, 16, 2011; March 25, 2011; April 1, 2011; May 4, 2011; June 15, 20, 22, 2011; and July 28, 2011. Simultaneous briefs were ordered to be filed by the close of business August 19, 2011, with simultaneous reply briefs to be filed by the close of business September 2, 2011. The trial lasted fourteen days. Eighty-two (82) documents were entered as full exhibits. Forty-two (42) more documents remained as exhibits for identification only and were not admitted. The court heard testimony from Garry Monk (All Pointe Care), Marissa Sessa (All Pointe Care), Tammy Bogue (Catholic Charities), Megan J., Sharyn Goode (Catholic Charities), Ashley C., Katherine D., Dr. James Connolly, Ph.D. (recognized expert in

forensic psychology), Dr. Lawrence Fenn (qualified expert in Special Education and employment in Special Education), Roxanne Winslow, Brenda Sheremeta (DCF), Dr. Ronald Anderson, Ph.D. (recognized expert in forensic psychology), Natasha Reed (DCF), Janet Billiter (DCF), Bob Wellemeyer, Dr. Jonathan Micaelis, Ph.D. (neuropsychologist, Bureau of Rehabilitation Services), Marek Kukulka, (Catholic Charities), Daniela Gorman (Director of Youth Services, Town of Waterford), Officer Charles Flynn (New London Police Department), and Jessica Corneau (Department of Rehabilitation Services). Dr. James Connolly was called or recalled to testify a total of three times and Dr. Ronald Anderson was called and recalled two times. On September 22, 2011, MGM filed a motion to reopen evidence to present newly discovered evidence. On September 29, 2011, argument on the motion was heard and the motion was granted with evidence to be presented on October 5, 2011. On that date, day fifteen of the trial, Gisele Vance of the Norwich Housing Authority testified and the trial was concluded on October 5, 2011.

Service of the motion was found to be properly made and Megan J. (mother), Carlos D. (father) and Katherine D. all appeared through counsel. Both mother and father appeared in court sporadically during the trial but eventually not at all. They were both defaulted on June 22, 2011, and their counsels were excused. There is no proceeding in any other court regarding the custody of the four minor children. This court has jurisdiction.

## II

### FINDING OF FACTS

The facts found in this decision are found by a fair preponderance of the evidence.

Katherine proceeds under § 46b-129 (j): "Upon finding and adjudging that any child or youth is uncared-for, neglected or abused, the court may commit such

child or youth to the Commissioner of Children and Families. Such commitment shall remain in effect until further order of the court, except that such commitment may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's legal guardianship in any private or public agency that is permitted by law to care for neglected, uncared-for or abused children or youths or with any other person or persons found to be suitable and worthy of such responsibility by the court, including, but not limited to, any relative of such child or youth by blood or marriage. *If the court determines that the commitment should be revoked and the child's or youth's legal guardianship should vest in someone other than the respondent parent, parents or former guardian, or if parental rights are terminated at any time, there shall be a rebuttable presumption that an award of legal guardianship upon revocation to, or adoption upon termination of parental rights by, any relative who is licensed as a foster parent for such child or youth, or who is, pursuant to an order of the court, the temporary custodian of the child or youth at the time of the revocation or termination, shall be in the best interests of the child or youth and that such relative is a suitable and worthy person to assume legal guardianship upon revocation or to adopt such child or youth upon termination of parental rights.* The presumption may be rebutted by a preponderance of the evidence that an award of legal guardianship to, or an adoption by, such relative would not be in the child's or youth's best interests and such relative is not a suitable and worthy person. . . .[2] (Emphasis added.)

It is noted that there has been an adjudication of neglect, the children are committed to the commissioner of DCF, a permanency plan of termination of parental rights and adoption has been approved (after

---

[2] General Statutes § 46b-129 (j).

three days of trial when mother withdrew her objection to the plan), the children are currently placed together with nonrelatives in a preadoptive (legal risk) licensed foster home where they have been for two years and eleven months, and no licensed relative foster caregivers are available. The moving party (MGM) is a blood relative who is not licensed as a foster parent for the children, nor is she a court-ordered temporary guardian of the children. The statutory presumptions in subsection (j) are not applicable to this case.

Katherine once held a foster care license from the State of Connecticut from March 31, 1987, to September 21, 1994. DCF took licensing action against her due to concerns about abuse and neglect of foster children in her care on two separate occasions. MGM relinquished her license prior to a revocation hearing decision. DCF did not close her license file in good standing.[3] This, together with issues of her seriously deficient judgment at times, concerns about her inadequate income and finances to be able to afford an unsubsidized guardianship, concerns with the fact that mother, whose children had been removed, who has unaddressed substance abuse and mental health issues and who had an open case with DCF, lived with MGM off and on at least until the commencement of the trial on the objection to the permanency plan held in March, 2010 (although MGM told Dr. Anderson that it was in January, 2010), cause DCF to object to MGM's motion for transfer of guardianship. Additionally, DCF noted that a court-ordered psychological evaluation done by Dr. Ronald Anderson did not recommend that she be considered as a long-term primary caretaker for the children. Exhibit #6 also noted that MGM's son, Nathaniel, had significant truancy issues and was supposed to be being home-schooled

---

[3] Exhibit #6, page 2.

by MGM, who holds a master's degree in special education, but was, in fact, living in Georgia where his educational needs were not being met. Her relative foster care license application was denied.

DCF notes that Katherine has a lengthy history with the Department both as a foster parent and as a subject of eleven referrals to the Department regarding her biological children.

"While [MGM] was a licensed foster parent the Department took steps to revoke her foster care license on two separate occasions in 1988 and 1994 due to several issues in the home, including an allegation that [MGM] assaulted a teenage foster child and became romantically involved with the twenty-year-old boyfriend of the same foster child. [MGM] decided to voluntarily relinquish her foster license in 1994, but her home was not closed in good standing.

"Although none of the eleven referrals to the Department regarding her children resulted in substantiations, it does show a pattern of concerning issues within her home. Several of the referrals were made by professionals in the community; two of the referrals were made by police officers and two were made by school personnel. One of the referrals was made by a family friend and one was made by [Katherine's] son, Jared. There were also four anonymous referrals and one made by a DCF Social Worker."[4]

Dr. Anderson (court-appointed psychological evaluator) notes MGM's explanation for the numerous referrals as follows: "When some of the DCF reports were reviewed with Katherine, she offered a lengthy, self-justifying account of how she was a licensed foster parent until she had conflicts with DCF over exposing her foster children to religion. She indicated that she

---

[4] Exhibit #19, pages 2 and 3.

later lost her foster license due to a technicality. She acknowledged that she has been involved with numerous DCF referrals and investigations in the past. She believed that many of them were instigated by her second husband, who had a history of anger problems. She said that none of the investigations concluded that abuse or neglect were substantiated, and pointed out that if they had, she would not be able to continue working as a substitute teacher. . . .

"Katherine undoubtedly has a different account of the events described in the reports, which include complaints by members of the community with whom she has evidently had conflicts. At the same time, the reports do suggest a degree of chaos in her life, accompanied by arguably questionable judgment, which she omitted from her own account of her recent life. This is consistent with the clinical impression and test data which suggest that she did not offer a very complete self-report, both due to a conscious attempt to present a socially-acceptable self-image, and also a tendency to repress or deny evidence of personal shortcomings."[5]

Although MGM "takes the position that unsubstantiated allegations [of abuse and neglect] are non-issues,"[6] the court does not. Dr. Anderson noted the various sources of the complaints and concluded that they suggest a degree of chaos in her life, accompanied by arguably questionable judgment. In reviewing MGM's comments and explanations in Exhibit #TT the court agrees with Dr. Anderson's assessment. The court does, however, agree with MGM's argument that the report by someone from the Navy base at Groton that MGM was "thoroughly disturbed" was groundless and is ignored by the court. The report by the physician at Gales Ferry Pediatrics who indicated that MGM "has

---

[5] Exhibit #2, pages 31 and 32 of 41.

[6] Exhibit #TT, page 3.

shown a history of poor judgment and a lack of priorities in raising the children" is not ignored. Nor is the report by MGM's daughter, Ashley, that MGM "had been talking about killing herself and was concerned about her well being. She was allegedly homeless with the children during parts of this investigation."[7] In fact, Dr. Anderson notes in great detail all of these issues.

"A 2006 DCF Investigation Protocol states that a friend of Megan's made an anonymous report to DCF, when Megan and her children were staying in her [Megan's friend's] home, and Megan's half-brother [MGM's son Jared] wanted to live with her because Katherine was homeless, because she had lost her teaching job, and she was sleeping in her car. The woman allowed Katherine to also stay with her, but when she did, Katherine did not make any effort to find her own housing. She noted that Katherine owned six horses, for which she rented stables. By the end of the month, the woman asked the family to leave. They moved in with Katherine's daughter, Ashley, but Jared had an argument with Ashley, so the woman allowed Jared to remain in her home. In August, the woman returned home to find Katherine asleep in her car. Ashley called her and reported that Katherine had talked about killing herself, so the woman allowed Katherine to move back into the home. A few days later, Katherine's son, Nathaniel, had problems with Ashley, so the woman allowed him back into her home, as well. The woman noted that Katherine usually left early in the morning, ostensibly to tend to her horses, and typically did not return until very late at night. When the woman saw Nathaniel walking away from the home, she called Katherine, who managed to get him and bring him back. Nathaniel said he did not want to leave with his mother and be homeless again. Following an argument with Katherine, the woman called the police, who said that Jared, because he was

---

[7] Exhibit #1, page 11.

age 16, could remain in her home. However, Katherine had his anti-seizure medications, and refused to provide him with them. She also allegedly told the woman that she hoped he had a seizure, so that she could sue the woman for endangerment. Jared was allowed to go to his father's house, but he left after one day, to return to the woman's house. When DCF contacted Katherine, she denied being homeless, and offered a lengthy explanation of why she was evicted from her apartment, and the various places that she had been staying, which include a driving trip to South Carolina, to bring Megan and her children back to Connecticut. She maintained that when she was told that Jared needed his medication, she gave a supply to Megan to give to him. Jared subsequently denied getting the medication, and told DCF that he thought that his mother had 'mental problems,' and was more concerned about her horses, with whom she spent most of her time, than she was about him. He wanted to go back to living with her, but only after she found an apartment. The investigation was closed with a referral to Rhode Island DCYS, when Katherine moved to that state, and Jared went with her. It was concluded that there was insufficient evidence to substantiate either abuse or neglect against Katherine."[8]

While the court finds that conclusion astounding, it notes that even unsubstantiated investigation protocols can be of assistance in determining patterns of behavior which may well be predictors of behaviors anticipated. Dr. Anderson so concluded in his report of March 23, 2009 (Exhibit #2), and reaffirmed it in his report of October 11, 2010 (Exhibit #18). Dr. Anderson concluded that at best MGM might be considered a short-term resource caring for the children with or without the presence of mother, while mother engaged in serious efforts to rehabilitate to resume her role as mother, but that MGM should not be considered a long-term

---

[8] Exhibit #2, page 5 of 41.

resource for the children. This was in March, 2009. Much has happened since then. Mother has ceased to be a viable candidate to resume her role as mother and consequently a permanency plan of termination of parental rights with adoption has been approved by the court.

In addition to the concerns mentioned above, of primary concern to DCF about MGM as a potential guardian of her grandchildren is MGM's seeming inability to comprehend or to acknowledge mother's significant deficits both as a mother and as her child. MGM did not take significant steps when mother had the children in her care to assure that they were safe and well provided for. Although at one point MGM sought and received temporary guardianship of the children from the New London Regional Probate Court, she never then took custody of them and they were in mother's care when DCF sought the first of two orders of temporary custody (OTC) on December 8, 2008. Several days prior to that date, mother was living in a homeless shelter with the children in Willimantic.

MGM has demonstrated an historical reticence to discuss aspects of mother's multiple problems and issues as they relate to mental health, special education and substance abuse with DCF. On August 13, 2008, DCF became involved with mother after receiving a referral that mother was smoking marijuana around her four children and abusing prescription drugs. Allegations of domestic violence between mother and father were also alleged as was a lack of money for the children, claiming it was instead being used to purchase drugs.

Most recently MGM has claimed to have learned about Megan's substance abuse issues for the first time at the permanency plan trial of March, 2010. Yet on December 12, 2008, the plea date after mother was

served with an OTC, MGM, who was cited in because she was temporary guardian under the Probate Court order and who was represented by counsel, Attorneys Ansell and Laben, attended the court session where the children were placed with MGM's daughter, Ashley. While it is not clear to the court whether MGM was in the case status conference room as the matter was discussed before the court, her counsel, Attorney Laben, was, and both of them were in the courtroom following that conference as mother was advised of her rights and the OTC was sustained by agreement. Attorney Laben had a copy of the affidavit of December 8, 2008, relied upon by Judge Driscoll as he signed the OTC. That affidavit is replete with information about Megan's struggles with prescription drugs, opiates and narcotics, failed drug screens involving drugs not pre-scribed by any doctor, attempts to obtain drugs from a hospital, her untreated prescription drug addiction, and her homelessness with the children. MGM testified that it is her nature to "ask a lot of questions." It is inconceivable to this court that MGM did not learn from that affidavit of mother's addiction or from Attorney Laben relating its contents to her, his client, as they discussed the placement with Ashley after DCF rejected placement with MGM, and that she would continue for another year and a half to maintain that she did not know Megan had a drug addiction until she heard it in court in March, 2010, during the permanency plan hearing. In fact, subsequent to the OTC, MGM attended several administrative case reviews (ACR) wherein Megan's drug issues were discussed and MGM left the ACR with a copy of the draft minutes of the meeting and proposed treatment plan for Megan which disclosed and discussed that issue.[9] MGM's testimony during this

[9] FTR, 2-10-11 @ 12:14:45 et seq. Testimony of MGM. [FTR (For The Record) is the recording facility of the court reporter which digitally records the testimony of a witness while noting the time of the utterance by hour, minute and second during that day's trial and which can be replayed by the court in chambers at any time.]

part of cross-examination by DCF was at first painfully evasive. This is consistent with a pattern of denial of any fact or situation which might in any way reflect poorly on MGM or any actions she has taken or failed to take.

MGM had always given Megan a safe harbor when she was in need, and never set boundaries or restrictions for her. This persisted even after the arrival of four grandchildren. Of concern to DCF is whether MGM has the ability to remain independent of mother and place the interests of her grandchildren above the demands and needs of her daughter, Megan. In asserting that she has, she points to the fact that she had all the locks where she lives changed because Megan and her half-brother, Jared, who has significant mental health issues, both had keys to the house and would come in whenever they wanted to. Unfortunately for MGM, her witness and close friend, Bob Wellemeyer, testified that he, in fact, had changed the locks, and did so at MGM's request because each lock had a different key and she wanted all the locks to work with the same key. There was no mention of keeping anyone, including Megan, out.[10]

The court must first examine whether or not MGM meets the requirement of suitable and worthy to be the guardian under the statute. General Statutes § 17a-1 (12) addresses the role of a guardian.[11] The responsibilities are akin to those of a parent. "The commonly understood general obligations of parenthood entail these

[10] FTR, 4-1-11 @ 2:34:22. Testimony of Robert Wellemeyer.

[11] General Statutes § 17a-1 (12) provides: " 'Guardian' means a person who has a judicially created relationship between a child or youth and such person that is intended to be permanent and self-sustaining as evidenced by the transfer to such person of the following parental rights with respect to the child or youth: (A) The obligation of care and control; (B) the authority to make major decisions affecting the child's or youth's welfare, including, but not limited to, consent determinations regarding marriage, enlistment in the armed forces and major medical, psychiatric or surgical treatment; (C) the obligation of protection of the child or youth; (D) the obligation to provide access to education; and (E) custody of the child or youth . . . ."

minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) *In re Angellica W.*, 49 Conn. App. 541, 551, 714 A.2d 1265 (1998). Whether or not one is suitable to assume such a role must be considered within the meaning of that word. "Suitable" is not defined in the statute, but is defined in Black's Law Dictionary (6th Ed. 1990) as "Fit and appropriate for the end in view." Webster's 9th Edition Dictionary defines it as "able, qualified" and defines "qualified" as "fitted (as by training or experience) for a given purpose. Competent." "Worthy" is defined in Black's as "Having worth; possessing merit; valuable; deserving of honor, or the like . . . ." Webster's defines it when used as a suffix as being "fit, safe." The court has adequate guidance to apply these two qualifying words to the facts at hand.

Katherine was born October 30, 1957. She has been married twice. Her first marriage resulted in the births of Ashley (d.o.b. 8-24-83) and Megan (d.o.b. 7-18-85). Her husband left while she was pregnant with Megan. In 1989 she married again. They had two children: Jared (d.o.b. 5-21-90) and Nathaniel (d.o.b. 2-1-94). This husband left while she was pregnant with Nathaniel. They divorced in 1995.[12] As noted below, MGM was very involved with mother and the children from the birth of Isaiah to the day of the OTC on December 8, 2008. In preparing an assessment on November 12, 2008, ordered by the Probate Court on October 16, 2008, when temporary guardianship of all four children was transferred from Megan to MGM,[13] DCF social worker

[12] Exhibit #B.
[13] Id.

Reed noted that "Maternal grandmother is very close with Megan and is her biggest support network. Maternal grandmother feels Mother wants to assert more independence with regards to providing for her children and is very opinionated. . . . She [MGM] reported she feels she can protect the children and denied Mother has a substance abuse problem as alleged. Maternal grandmother is aware Mother missed her substance abuse evaluation. She feels she is capable of caring for the children and in setting limits."[14] According to that assessment the children were placed with MGM on November 3, 2008.[15] DCF stated to the Probate Court that it had insufficient information upon which to make a recommendation and therefore offered no recommendation concerning the transfer of guardianship. The Probate Court had already granted the transfer of guardianship on October 16, 2008, vesting temporary guardianship of the four grandchildren with MGM for one year.[16] The children were under that temporary guardianship of MGM when they were, in fact, with Megan in a homeless shelter at the time of the OTC on December 8, 2008. MGM reported to Dr. Anderson that the Probate Court had granted her "joint guardianship" with Megan and at the time Megan was in the shelter with the children, MGM was also homeless, living in a motel.[17] A review of the Probate Court order from Judge Greene indicates sole guardianship in MGM, not joint with anyone else.[18] MGM reported to social worker Reed that the grandchildren had stayed with her previously from August, 2007, until June, 2008. MGM reported to Dr. James Connolly, Ph.D., her privately retained psychological evaluator, that Megan frequently moved around and was conducting an intermittent unstable

---

[14] Id.

[15] Id.

[16] Exhibit #L.

[17] Exhibit #18, page 4 of 13.

[18] Exhibit #L.

relationship with Carlos D., father of all the children. During that time MGM reported she was the primary caretaker of the children on and off, as she had been since their births.[19] As a result of the OTC the children were placed with MGM's daughter, Ashley C. At the same time, MGM was living with Ashley as she was unemployed and homeless, explaining that she was studying to take the LSAT exam as she wanted to attend law school. Megan was also living with Ashley. As she had in the past, Megan would continue to live with MGM wherever she might be off and on until December, 2009. MGM has resided in six separate residences in the past five years.[20] She currently resides in an apartment in Norwich under a lease and is due to receive a Section 8 housing voucher within the month. The residence has adequate space for the four children plus MGM's youngest son, Nathaniel, age seventeen. MGM is a teacher by profession. She earned a master's degree in special education in 1996,[21] certificated for history, social studies and comprehensive special education (PK through 12), valid through June 28, 2012.[22] She has not been employed in the education field in over five years. She is currently working towards her "6th year" certificate. Her last held full-time teaching job ended in August, 2006. She has never held a teaching job for longer than two and one-half years. She started with two single year teaching jobs, followed two years at Mount Saint John's School, then Project Learn for two and one-half years, then one year at Stonington Institute, then part time at Grasso Technical High School,

[19] Exhibit #AA.

[20] FTR, 2-10-11 @ 11:05:02. Testimony of MGM. [FTR (For The Record) is the recording facility of the court reporter which digitally records the testimony of a witness while noting the time of the utterance by hour, minute and second during that day's trial and which can be replayed by the court in chambers at any time.]

[21] Exhibit #V.

[22] Exhibit #K.

then a full-time position in Hartford for one year[23] where she was "laid off."[24] However, she told Dr. Ronald Anderson, Ph.D., court-appointed psychological evaluator, that "it was a lengthy commute, and during her first year, there were two drive-by shootings at the school. She left that position, and moved to Rhode Island, to live with a man that she intended to marry."[25] She claims to have sent out resumes with employment applications but could only recall two such occasions. She remained unemployed until she took a job at Home Depot in December, 2009, earning ten dollars and some change an hour. She still holds that job and works between thirty-five and thirty-eight hours a week.[26] Although all indications are that she will not be returning any time soon to the field of education, she has demonstrated an ability to hold her current job at Home Depot and with the other social assistance programs she testified to, including food stamps, Title VIII housing, Husky, child support, although that will end on February 1, 2012, a nutrition assistance program, and TANF cash assistance, the court finds that she would be able to bring together enough by way of these means to maintain financially the guardianship of the children albeit in a meager fashion. Additionally, the court notes that she has retained private counsel for this matter, hired a psychologist to conduct an evaluation and testify on three different occasions in court, hired a private attorney in Georgia to deal with the pending legal matters concerning Megan's youngest child (not a party to this case) in that state, and this court has found that she did not qualify for transcripts of this trial at taxpayer expense, all reinforcing its belief that she has adequate financial resources to provide for the children were they to become her wards.

---

[23] Exhibit #5.

[24] FTR, 2-10-11 @ 11:05:56. Testimony of MGM.

[25] Exhibit #2, page 23 of 41.

[26] FTR, 2-10-11 @ 10:38:12. Testimony of MGM.

Katherine was examined by court-appointed forensic psychologist, Dr. Ronald Anderson, Ph.D., twice, once in March, 2009, and again in September, 2010. She was also examined by her privately retained forensic psychologist, Dr. James Connolly, Ph.D. in October/November, 2010. Both doctors are well known to the court as competent, knowledgeable, straightforward professionals who are experts in their field. Such professionals do not always agree. When they disagree it is incumbent upon the court to pay careful and close attention to each as to structure, methodology, content and normative process of each evaluation used by each doctor in order for the court to form an opinion as to which divergent point of view is probably more in keeping with aggregated facts of the case found by the court. In both instances the doctor must rely to some degree on the self-report of the patient, but then must check such self-reported information against the other collateral information which each received or initiated, including documents and clinician interviews to help establish a more accurate psychological picture of the patient. Additionally, each must avail himself of the most current testing and normative materials available, together with the most current psychological studies, treatises, and research in their chosen field, thus enabling each to opine and recommend more precisely in line with this subtle, complex and changing discipline.

Dr. Anderson's first evaluation, which was of Megan and MGM, came about by court order after DCF was forced to seek an OTC because the relative foster care placement, Megan's sister and MGM's daughter, Ashley C., could no longer care for the children because her husband, an active duty member of the U.S. Navy, had received orders transferring him from Groton to a Navy base in Georgia. Projective personality testing was accomplished by conducting the Rorschach Inkblot

Method (RIM) and the responses were scored with Exner Comprehensive System and interpreted with the computerized Rorschach Interpretive Assistance Program-3. The result suggested someone who was very resistant to the test situation at the onset and disregarded instructions or distorted cues substantially because of her sense of outrage. She was found possibly to be self-centered with an exaggerated sense of self-worth which would then tend to dominate her perceptions of the world. She placed excessive reliance on the defenses of rationalization and denial when challenges to her integrity occurred. She experienced situational stress during the test, which may have had an impact on her performance. Although she had just been examined by Dr. Jennifer Caruso, Psy.D.,[27] who found situational stress to be an issue for her, curiously she did not share this with Dr. Anderson, nor with her clinician-therapist, Tammy Bogue, while she did share it with Dr. Connolly, her private evaluator, who, as will be noted below, found it to be an excuse or a reason for some test results. MGM called it "test anxiety." Dr. Anderson testified that he did not find that MGM had "test anxiety."[28] Dr. Connolly found that she did have it "but she was able to complete the psychological tests I chose to administer to her. . . . Her tendency to "space out" for brief periods of time during examinations and evaluations did not significantly impede the process of the psychological evaluation."[29] In the objective testing, situational stress apparently plays a far less important role particularly because the person being evaluated, always somewhat defensive in a child protection case, will be far less able to manipulate the outcome in accordance with his or her desired outcome. The tests are designed to cap such anxiety.[30]

---

[27] Exhibit #XXX.

[28] FTR, 2-14-11 @ 2:15:03. Testimony of Dr. Ronald Anderson.

[29] Exhibit #AA, pages 2 and 3.

[30] FTR, 2-14-11 @ 2:14:27. Testimony of Dr. Anderson.

Dr. Anderson used the Paulhus Deception Scales (PDS) which assess two components of defensiveness: self-deception and impression management. Self-deception is a reflexive tendency towards unrealistic, idealized self-perceptions while impression management reflects an attempt to project a highly favorable self-image. The scoring was computer assisted. The results showed extreme elevations on both impression management and self-deception. Such people lack the insight to deal with problems and usually present as rigid. They tend to take a sanctimonious view of other people's problems. Dr. Anderson also used the Personality Assessment Inventory (PAI) which was also scored by a computer assistance program. The results reflected "an unusual response set, marked by notable defensiveness about some personal shortcomings, accompanied by a tendency to exaggerate certain problems. She tended to portray herself as being exceptionally free of common shortcomings to which most individuals will admit. Quite reluctant to admit to minor faults, she may not even admit these faults to herself. Blindly uncritical of her own behavior and insensitive to any negative consequences that may arise from it, she tends to minimize the negative impact that her behavior has on others and on herself. . . . She has little interest in counseling treatment, since her responses suggest that she is satisfied with herself as she is, is not experiencing much distress, and sees little need to change her behavior."[31] The several other tests were basically unremarkable except to note difficulty in setting limits with others and surprisingly little awareness of the capabilities and behavior of children at different ages, suggesting a weak understanding of child development. While the court is concerned that some of the information MGM supplied to Dr. Anderson was in serious conflict with evidence established at trial, it notes that most of the inconsistencies reflect the constant refusal to take ownership of

---

[31] Exhibit #2, pages 25 and 26 of 41.

anything negatively reflecting on her, and this is in keeping with the test results elicited by Dr. Anderson. When a fact cannot be avoided, there is a long, convoluted explanation deflecting direct responsibility from her to some other circumstance beyond her control. Her testimony over several days, especially on cross-examination, was replete with such behavior. Dr. Anderson summed it up as follows: "The objective test results reflect notable defensiveness, characterized by extreme tendencies to engage in impression management and self-deception. Impression management involves a conscious effort to present a positive self-image, while self-deception is an unconscious bias to view the self in unrealistic, overly positive terms. . . . She tends to be blindly uncritical of her own behavior and insensitive to any negative consequences that may arise from it."[32]

Some eighteen months later, in September, 2010, less than two months before this trial began, Dr. Anderson performed another evaluation, this time of MGM only. For this evaluation Dr. Anderson used the objective Minnesota Multiphasic Personality Inventory 2-RF (MMPI-2RF) at a computer terminal. It was scored and interpreted with the software licensed from the test publisher. "Katherine responded to [this test] with a socially-desirable manner that reflects a tendency to under-report personal problems and to portray herself as being extremely well-adjusted. The level of adjustment that she reported is relatively rare in the general population. However, the pattern of her responses suggests a tendency towards externalizing behaviors that are usually found with individuals who have a history of antisocial behavior, relationship conflicts, and particular difficulties with individuals in a position of authority."[33] "Katherine's responses to the objective tests in the previous evaluation reflected both defensiveness

[32] Exhibit #2, page 30 of 41.
[33] Exhibit #18, page 4 of 13.

characterized by a lack of personal insight and a tendency to deny having any personal shortcomings, and a tendency to exaggerate certain situational problems. For the present evaluation, she was administered the MMPI-2RF. The results again reflected a defensive tendency to under-report personal problems and to describe herself as being extremely well-adjusted. Surprisingly, the results suggest a history of antisocial behavior, relationship conflicts, and particular conflicts with authority figures."[34] As a result of the prior evaluation wherein counseling was advised for her, she has been seeing a therapist, and Dr. Anderson notes that she now seems to recognize that in the past, she was too lenient with Megan, but she stopped short of acknowledging the degree to which she enabled her daughter's irresponsibility. There was testimony that Megan has had an ongoing addiction to prescription medication for a long time. As noted above, MGM claims never to have known this until the permanency plan hearing, although that assertion defies credibility. During that time, Katherine would share her own pain medication with Megan. It is not clear to Dr. Anderson whether MGM has acquired a better understanding of her past mistakes, or even that she is better able to acknowledge past or present personal weaknesses or shortcomings that she has worked to overcome in counseling. The results of this new evaluation do not provide a clearer picture of Katherine's personal insight and problem-solving skills which play a role in long-term stability and parental caretaking. He concludes that although Katherine has been seeing a counselor for nearly a year, she continues to present with extremely limited insight. She acknowledged that her daughter was able to "walk over" her in the past, but otherwise did not identify any personal problems or shortcomings which she might be striving to overcome. She has limited problem-solving skills and thus there is no strong

[34] Exhibit #18, page 4 of 13.

basis to make a prediction about her future adjustment and stability. Her interaction with the children reflected strikingly poor judgment. Clearly Isaiah's oppositional tendencies would increasingly conflict with MGM's authoritarian style.

Dr. Connolly encapsulated the primary issue of this case as follows: "During my clinical interviews with Katherine D . . . I asked her in detail about her relationship with her younger daughter, Megan. Megan is the mother of the four grandchildren who are the subject of the current child protection action. I was particularly concerned about the issue of whether Katherine would be able to maintain appropriate boundaries with Megan, who appears to have significant substance abuse and relationship problems that have resulted in the removal of her children from her care. Obviously, if Katherine is to be able to act effectively as the guardian and primary caregiver for Megan's four older children, it will be necessary for her to maintain boundaries with Megan. Katherine described a painful but necessary process of distancing herself from Megan. She does not allow Megan to live in her apartment. In late 2009, Katherine renewed her apartment lease without Megan's name on the document. Megan has no key to Katherine's apartment. Since late 2009, Katherine has allowed Megan no access to her automobile. Katherine has also ended her payment of Megan's cell phone bills and automobile insurance. I inquired of Katherine the reasons why some months ago she had accompanied Megan to Georgia where Megan gave birth to a fifth child. Katherine explained that she disapproved of Megan's lifestyle, her ongoing relationship with her abusive boyfriend, and her use of illegal drugs. Katherine explained at the time Megan was leaving for Georgia, there was reasonable concern for Megan's physical safety, since she had labor pains during the trip to Georgia and the general process by which she has put

limits in place in her relationship with Megan, led me to conclude that although Katherine clearly will have to be careful about maintaining boundaries with her misguided daughter, she has made progress in this area over the past two years."[35]

It is difficult for the court to understand how Dr. Connolly can conclude that MGM has made progress "over the past two years" in distancing herself from Megan when MGM argues that she just learned of Megan's addiction during the trial on the permanency plan and considering MGM's involvement in mother's trip to Georgia to get this new child out of the jurisdiction of Connecticut. That episode will be examined in detail below.

Dr. Connolly administered the MCMI-II, the Rorschach and the TAT. The MCMI-II is not as new as the MMPI-2-RF administered by Dr. Anderson but seeks in a general way to obtain the same information in order to assess the level of adjustment. Dr. Connolly found in MGM a quite low level of disclosure but not so low as to invalidate her results. She had high profiles on three scales: impulsive personality pattern, antisocial personality pattern, and schizoid personality pattern, but not great enough to consider a diagnosis of personality disorder. It indicates that she can sometimes be rigid in pursuing her own idiosyncratic way of doing things. Her Rorschach protocol was rather extensive, affected by a certain amount of blocking which appeared to be related to her test anxiety. Dr. Connolly did say, however, that test anxiety "did not significantly impede the process of the psychological evaluation." The TAT was also affected by some latencies related to the test anxiety, although it showed her as indicative of a social attitude that was optimistic, accepting of personal differences, and interested in sharing positive

---

[35] Exhibit AA, page 5.

experiences. The evidence in this case is not replete with instances which support any of those findings and, in fact, seems to indicate quite the opposite. Dr. Anderson noted that the test result he received from her in one test showed that she was "blindly uncritical of her own behavior and insensitive to the negative consequences that may arise from it."[36] She is, in fact, reporting that she does not have any problems of any sort.[37]

Dr. Anderson testified that Dr. Connolly's report was notably one-sided, and although he obtained essentially the same results in personality testing as Dr. Anderson did, he made less of it and there was nothing critical whatsoever in his report. Dr. Connolly observed the evidence of defensiveness on the test results was caused by test anxiety whereas Dr. Anderson found absolutely no evidence of anxiety at all on the MMPI-2-RF.[38] Defensiveness and the inability or unwillingness to accept responsibility or acknowledge shortcomings has been the hallmark of her persona as shown throughout the evidence of a fifteen day trial. For Dr. Connolly to note nothing critical strikes the court as unusual at least. Dr. Connolly pointed out that a psychologist, in accordance with the American Psychological Association guidelines, should not overinterpret clinical or assessment data. Dr. Anderson rejoined that neither should a psychologist underinterpret as well.[39] The guidelines call for appropriate interpretation.[40] The key to clinical interpretation of a clinical personality inventory test is how the test is scored. Dr. Connolly chose to score the psychometric "clinical personality inventories" tests he gave without the benefit of computer

---

[36] FTR, 2-14-11 @ 2:17:58. Testimony of Dr. Anderson.
[37] FTR, 2-14-11 @ 2:19:06. Testimony of Dr. Anderson.
[38] FTR, 2-14-11 @ 2:14:56. Testimony of Dr. Anderson.
[39] FTR, 2-14-11 @ 2:15:03. Testimony of Dr. Anderson.
[40] Exhibit GG.

review while Dr. Anderson used a computer program with updated software so that the scores can be measured against a national norm. Dr. Connolly testified that he did his own scoring because he was "disillusioned" by computer programmed interpretations.[41] Both the TAT and the Rorschach are a subjective effort within the constraints of a standardized instrument. However, there are standardized norms available for the Rorschach and Dr. Connolly used the Samuel Beck norms (the original norms from his old professor, Beck) which were based on "a large sample for the time."[42] For all of his testing, "I hand score it and interpret it myself."[43] Computerized scoring, although he acknowledges it allows access to larger normative samples, does not assist in a sensible interpretation and produces "gibberish."[44] The court is at a loss to understand how a score measured against a national norm is of less value than a score measured against the experience of one psychologist and is grateful that the majority of psychologists have joined the digital age. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Internal quotation marks omitted.) *In re Rafael S.*, 125 Conn. App. 605, 611–12, 9 A.3d 417 (2010). Dr. Anderson noted that MGM has extremely limited insight, a history of antisocial behavior and conflicts with authority figures, and uses strikingly poor judgment. The court is not persuaded by Dr. Connolly's disagreement with this assessment. Additionally, the court notes Dr. Connolly's reluctance to factor into

[41] FTR, 11-4-10 @ 3:44:38. Testimony of Dr. James Connolly.

[42] FTR, 11-4-11 @ 3:43:03. Testimony of Dr. Connolly.

[43] FTR, 11-4-10 @ 3:44:43. Testimony of Dr. Connolly.

[44] FTR, 11-4-10 @ 3:45:01. Testimony of Dr. Connolly.

his results in a significant way the reality that MGM's disclosure to him was low or perhaps significantly low. Dr. Anderson testified that her disclosures to him were significantly low.[45] He noted that the best predictor of future behavior is recent past behavior. The extraordinarily poor judgment she exhibited in the August 5 and 6, 2010 incident in Rhode Island, to be discussed in detail below, is illustrative of where anxiety is likely a factor, and she is going to experience anxiety in any situation where her actions are or are going to be assessed.[46] Interestingly, anxiety management was not one of the goals established between MGM and her counselor, Tammy Bogue, beyond MGM's feeling "worried" about her daughter losing her children to DCF and a hopeless feeling on occasion.[47] Ms. Bogue did not discuss anxiety as an issue with Dr. Anderson,[48] although she testified that MGM presented with stress and anxiety.

MGM has been in counseling with Tammy Bogue of Catholic Charities since November 23, 2009. On October 2, 2009, as part of the intake process, the form noted, "She is seeking treatment because her daughter's children have been removed from the home and DCF recommends she seek therapy. Pt. reports an increase in feeling 'stressed,' 'hopeless,' and 'worried' since her grandchildren have been removed from the home."[49] Her first session was November 23, 2009, and they met weekly. Ms. Bogue is working towards receiving her license as a marriage and family counselor, having received her master's degree in 2009 and is still under supervision as she gains the necessary practical hours of experience before taking the examination. Her diagnosis was adjustment disorder, wherein she needed to

---

[45] FTR, 6-22-11 @ 2:21:00. Testimony of Dr. Anderson.

[46] FTR, 6-22-11 @ 2:28:19. Testimony of Dr. Anderson.

[47] Exhibit #A, page 6.

[48] FTR, 6-22-11 @ 2:26:45. Testimony of Dr. Anderson.

[49] Exhibit #A, page 16.

work on her coping skills and separating herself from Megan. Ms. Bogue notes that MGM has made progress in addressing stress and anxiety.[50] MGM never discussed "test anxiety" with Ms. Bogue. She feels that progress is being made as MGM changed the locks on her apartment, Megan no longer lives with her, and she took Megan off her cell phone plan. Dr. Anderson thinks that MGM has a lack of insight but Ms. Bogue disagrees. She finds no antisocial behaviors in MGM. She is now less stressed because she is working. Ms. Bogue did acknowledge that she forms her opinions based upon MGM's self-report. She also acknowledged that MGM never gave her a release to talk to DCF although MGM did give her releases to talk to her attorney, Dr. Anderson and Dr. Connolly. Perhaps Ms. Bogue does not recognize DCF as an authority figure, because she testified that MGM's interaction with authority figures is fine. It is of great concern to the court, however, that Ms. Bogue had to rely so heavily upon MGM's self-report. Ms. Bogue's supervisor, Marek Kukulka, testified in response to this issue, that in some cases therapists are like lawyers representing a client/patient, tacitly acknowledging there is little objectivity involved in the "treatment" as it is geared more towards "defense." Nonetheless Ms. Bogue feels that she has a good relationship with MGM which she clearly wanted to preserve as she testified, and such preservation is appropriate even though the treatment may be stunted by the lack of objective facts coming from the patient. It is noted that MGM had been in therapy with Ms. Bogue for nine months when the events of August 5 and 6, 2010, occurred. MGM never discussed the Georgia trip of August 6 with Ms. Bogue before she engaged in it.

Prior to the events of August 5 and 6, there was an important event which occurred in March, 2009. The

---

[50] FTR, 11-1-10 @ 2:17:20. Testimony of Tammy Bogue.

children had been placed by DCF with Megan's sister, Ashley C., upon the first OTC as noted above. Ashley and her Navy husband lived with their three minor children in government housing attached to the Navy base in Groton. DCF had concerns about the interactions of MGM with her children, noting that MGM had shared her prescription narcotic medication with Megan who appeared to DCF to be addicted to such medications and MGM may be enabling Megan, as noted by social worker Natasha Reed.[51] MGM, of course, denied that Megan had an addiction and only learned of it at the permanency plan hearing as noted above. DCF's concern is reflected in two documents referred to as service agreements. The first, dated March 4, 2009, states, "Maternal aunt, Ashley C. . . . will not allow maternal grandmother, Katherine D. . . . unsupervised contact with mother's children."[52] It is signed by Ashley and Ms. Reed of DCF. The second, signed by Ashley and a different DCF worker on March 24, 2009, states, "Maternal aunt, Ashley C. . . . will immediately call the DCF Hotline (1-800-842-2288) and the police (911) if maternal grandmother (Katherine D.) or mother (Megan J.) try to take the four children in her care . . . .").[53] This was prompted by a phone call to DCF from Ashley in February, 2009, after MGM, upon learning that Ashley would not be able to take the children with her to Georgia where her husband was being reassigned, threatened Ashley that if she did not take the children, MGM would call DCF and complain that Ashley was abusing the children.[54] At the time of the actual removal under the second OTC on March 27, 2009, DCF and Ashley had coordinated the removal so that the police were already present at the time DCF arrived at the house. Ashley had wanted Megan and MGM to be

---

[51] Exhibit #30.

[52] Exhibit #37.

[53] Exhibit #38.

[54] FTR, 3-25-11 @ 12:16:10. Testimony of social worker Natasha Reed.

able to say goodbye to the children with DCF already there at the time Megan and MGM arrived. However, DCF arrived a little late and they were already there and causing considerable disruption. At one point MGM claimed to have been struck by Ashley and lifted an article of clothing to try to show the marks, only to be separated by the police. The children were present for all of this. Moments prior to this MGM was trying to unpack the children's things, saying that she had purchased some of those things and they were not going with the children. Ms. Reed of DCF arrived to yelling and arguing among MGM, Megan and Ashley. Ashley was trying to get MGM and Megan to leave, thus alleviating the disruption and chaos going on, but to no avail. The children knew they were going to another home since Ashley had done a good job of preparing them for the change. The chaos continued, including MGM yelling at Ashley, outside and toward the van where the children and their things were being loaded.[55] It was at once a disturbing and telling scene.

A second and truly notable event occurred on August 5, 2010. Megan had again become pregnant by the father of her four children, the subject of this trial, and she started to go into labor on August 5, 2010. She went to a Westerly, Rhode Island, hospital. Notes taken by hospital staff at 11:50 p.m. indicate a discussion between Megan, MGM and a member of the hospital staff, Suzan Menihan, around the fact that Megan did not have custody of her other four children who were in foster care. Ms. Menihan was told that the children were "lost" due to homelessness and could not be returned until she had completed a parenting class. When asked why she needed a parenting class for homelessness, MGM is noted in the report to be very unhappy that such a question was asked. It was then revealed

---

[55] FTR, 3-25-11 @ 12:18:00 through 12:22:40. Testimony of social worker Natasha Reed.

to Ms. Menihan that father was involved with domestic violence and had been incarcerated for it and may be going back to jail on a violation. MGM told Ms. Menihan that she was going to take her LSAT exam and was going to be a lawyer.[56] MGM told Ms. Menihan that she had filed for a "transfer of care" but there is a "very wealthy family" that wants the twins and "it is very political." Mother reported that she had received prenatal care at another hospital, but when Ms. Menihan called that hospital they had no record of her having been treated there except for some early ultrasounds. Ms. Menihan noted that MGM asked many questions about Rhode Island and Connecticut DCYF and who had jurisdiction. MGM then asked that DCYF not be called. It was explained to her that both DCYF and Social Services will be notified and it will be their job to determine what happens with the baby and that "I must notify both DCYF and Social Services for anyone who presents with records and especially with the information that has been revealed."[57] At that point MGM told Ms. Menihan that mother was planning to go to Georgia and that the father of the baby was also going, and that they had been scheduled to have gone the day before. "This is how we are going to handle this baby," MGM told Ms. Menihan.[58] The child protection agencies of both states were notified. In the meantime Megan had given a urine sample which tested positive for cocaine, opiates and THC. MGM questioned what the levels were in the test.[59] She wanted to know if the test could be positive if the patient had intercourse with someone who had done drugs.[60]

Because of this failed drug screen there was immediate need for a neonatal intensive care unit (NICU) which

---

[56] Exhibit #27.
[57] Exhibit #24.
[58] Exhibit #24.
[59] Exhibit #27.
[60] Exhibit #24.

Westerly Hospital did not have. The recommendation was for immediate transfer to Women and Infants Hospital (W & I) in Providence. MGM stated that as long as the cervix was not changing, mother's options were to stay there or go home and at that point advised Megan to "stop contracting." At this point Megan loudly told MGM to "stop it. Leave it alone." Ms. Menihan, noting the need for an NICU, made arrangements for the transfer to Providence. Megan traveled by ambulance and MGM followed. Upon arrival at W & I she was examined and progression remained stable so she was admitted to the acute care unit for monitoring overnight. In the morning her situation remained the same and testing revealed an overall reassuring fetus with moderate variability and "spontaneous accels with occasional brief decel" of 40 points. Her AFI test revealed "she was 8."[61] Given that, she was discharged home with "strict precautions" to follow up with her doctor, Dr. McKnight, on August 9, 2010, at 3:30 p.m.[62] Instead, MGM immediately had her friend, Robert Wellemeyer (the one who changed the locks), change Megan's flight to now include MGM, as MGM testified she did not know how to do it, and tickets were acquired for both of them to fly to Georgia to have the baby, intending to have Ashley take guardianship of it (the baby shortly thereafter became "Savannah"). That happened on August 6, the day she left W & I. It was done without any medical approval, hours after leaving a hospital with an NICU so important to a newborn's aftercare whose mother was testing positive for cocaine, opiates and THC. The degree of recklessness both for mother and child is egregious. MGM now maintains that she had no way of stopping Megan. This strikes the court as absurd. Her actions bring new meaning to the expression, "aiding and abetting." The options

[61] Exhibit #23.
[62] Exhibit #23.

that MGM had to protect her daughter and the unborn baby were almost limitless. They were not going to be protected at 40,000 feet. It is no defense to state that she did not deliver until after she arrived in Georgia. Averting a disaster is not a defense for letting the potential situation arise in the first place. It is clear to the court that MGM has employed virtually nothing of what she was supposed to have learned in treatment with Ms. Bogue. Her judgment was terrible. She demonstrated an absolute inability to keep anyone safe in an emergency situation. She has accepted no blame for her actions. Instead she feels that she should be congratulated for trying to help her daughter at a difficult time. She clearly views DCF as the enemy and therefore will forgo taking safety measures on behalf of children if DCF might become involved. Her actions with Ashley at the time of the OTC removal reflect this. If her goals are threatened, she will inflict injury on her own child to attain her goal. Why else would she threaten to call DCF about Ashley, her own daughter, and falsely claim that Ashley abused the children in order to have her own way? This case is about safety. It matters not that MGM had some good visits with her grandchildren. It matters not that she may have a bond with them and they with her, although some of that bond arises out of the close relationship MGM has with mother, with whom they clearly have a bond. They also have a bond with their foster parents with whom they have been for three years less three months. There are times when children should not be placed with blood relatives, and one of those times is when their safety, their ongoing need for healthy nurturing, their need to be led by positive example and absolute honesty, clearly will not happen if they were so placed. The statute directs that the court must find the candidate to be "suitable and worthy."

MGM's track record with her own children leaves a great deal to be desired. Ashley has done well and that

may be why her relationship with MGM is conflicted. Megan is the reason this entire matter is before the court in the first place. Jared has some serious medical and emotional problems and MGM's solution at one point was to withhold his antiseizure medication from him. Nathaniel is only seventeen. The court has little knowledge about him upon which to form a judgment beyond noting that he had serious truancy issues and was supposed to be home-schooled by MGM but was, in fact, in Georgia during some of that time. No evidence of home schooling approval was introduced.

Dr. Anderson testified that based upon his evaluations and taking into account all of the facts which have transpired, many of which are recounted in this memorandum of decision, he does not believe that the children should be placed in MGM's care.[63]

As noted above, "Suitable" is not defined in the statute, but is defined in Black's Law Dictionary (6th Ed. 1990) as "Fit and appropriate for the end in view." Webster's 9th Edition Dictionary defines it as "able, qualified" and defines "qualified" as "fitted (as by training or experience) for a given purpose. Competent." "Worthy" is defined in Black's as "Having worth; possessing merit; valuable; deserving of honor, or the like . . . ." Webster's defines it when used as a suffix as being "fit, safe." Based upon all of the evidence heard and based upon a review of all of the full exhibits, the court cannot find that Katherine is suitable and worthy to receive guardianship of the children. The court is not convinced that she has either the ability or the will to insulate the children from mother. While the court notes that MGM has taken some steps she should have taken long ago to accomplish this, it is clear to the court that what she is doing is for the benefit of getting DCF and the court out of her life and not to protect

---

[63] FTR, 6-22-11 @ 2:28:39. Testimony of Dr. Anderson.

the children from mother. While she had a visitation session with them observed by Dr. Anderson she proceeded to talk about mother and the new baby, Savannah, and show them pictures of the baby on her phone. Dr. Anderson noted this as "questionable judgment."[64] The circumstances surrounding the removal of the children from Ashley's home and the circumstances surrounding the setting up and carrying out of the Georgia trip show not only terrible judgment, but also that Megan is still very much part of Katherine's life, thought process, and action plan. She still does not understand, or refuses to accept, that Megan has serious issues detrimental to her children. MGM's poor judgment and her resistance to acknowledging any shortcomings of her own make her a poor candidate to raise these children. Dr. Anderson noted as follows:

"Although Katherine has been seeing a counselor for nearly a year, she continues to present with extremely limited insight. She acknowledged that her daughter was able to 'walk over' her in the past. But otherwise did not identify any personal problems or shortcomings which she might be striving to overcome. She responded to the personality testing in a similarly defensive manner, though the test results suggest a history of antisocial behavior and conflicts with authority figures. Consequently, the results of her individual evaluation are mixed, in that despite the clinical impression that Katherine has limited problem-solving skills, the data do not provide a strong basis for making predictions about her future adjustment and stability.

"The way in which Katherine approached the observed interaction with the children reflected strikingly poor judgment. . . . While it appears that the children have an established bond with their grandmother, it is not clear whether she could, as a single working

---

[64] Exhibit #18, page 9 of 13.

parent, provide them with the care and protection that they need."[65]

The court agrees with the findings of Dr. Anderson. They are supported by the evidence in the case. Dr. Connolly made a valiant effort for his patient, and he is to be commended for that effort. He adopts the position that one should not be too harsh in interpreting the data, and that there are nuances to be observed. He does this because he basically came to the same conclusions as did Dr. Anderson as to the testing results, but he interpreted them in a way less critical to his patient. The court, however, must observe the language of the statute. Accepting that "suitable" means "fit and appropriate for the end in view," the court cannot and does not find that Katherine fits this definition. The evidence indicated that she is not "able" or "qualified" meaning "fitted (as by training or experience) for a given purpose of raising these young children. From the time of the OTC to now, considerable time has elapsed, and any signs of improvement so as to fit the definition of "suitable" have not been forthcoming. Having found that, it cannot be in the best interests of the children that MGM becomes their guardian.

## III

## ORDER

The court finds that Katherine has failed to establish by a fair preponderance of the evidence the statutory requirements set forth in § 46b-129 (j). The motion for transfer of guardianship is denied.

---

[65] Exhibit #18, page 12 of 13.