# IN RE RAFAEL S.*
## (AC 31772)

Bishop, Robinson and Hennessy, Js.

Argued October 13—officially released December 21, 2010

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Elizabeth Knight Adams*, for the appellant (respondent mother).

*Stephen G. Vitelli*, assistant attorney general, with whom, on the brief, was *Richard Blumenthal*, attorney general, for the appellee (petitioner).

*Scott M. Maser*, for the minor children.

*Opinion*

ROBINSON, J. The respondent mother appeals from the judgments of the trial court terminating her parental rights with respect to her minor children, Jacqueline and Rafael. On appeal, the respondent claims that the trial court improperly concluded that termination of her parental rights served the best interests of the children.[1] We affirm the judgments of the trial court.

---

[1] In her brief, the respondent also claims that the trial court improperly concluded that she had failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in their lives. During oral argument, however, the respondent's counsel informed the court that the respondent was abandoning this issue. We will address, therefore, only the remaining issue on appeal.

In its memorandum of decision, the court found the following facts. Jacqueline and Rafael were born in March, 1995, and February, 1998, respectively. On April 6, 2004, the petitioner, the commissioner of children and families, filed neglect petitions on behalf of the children, alleging that they were being denied proper care and attention and were permitted to live under conditions injurious to their well-being. On May 25, 2004, the respondent and the children's biological father[2] each entered a written plea of nolo contendere to the allegations. The disposition for both children was a six month period of protective supervision with both parents.

On June 7, 2004, the petitioner filed applications for orders of temporary custody, alleging that both children were in immediate physical danger from their surroundings and that their continuing to live in their home was contrary to the welfare of each child. The orders of temporary custody were granted. The petitioner also filed a motion to open the disposition of protective supervision and to modify the disposition to commit each child to the petitioner. On August 13, 2004, the parties agreed to modify the disposition, the court accepted the agreement and the children were committed to the custody of the petitioner. On March 17, 2005, the parties reached an agreement to revoke the commitment of each child. The court accepted the agreement, ordered that custody of the children revert back to the respondent and imposed an additional six month period of protective supervision.

On June 20, 2006, the petitioner again filed applications for orders of temporary custody. The applications raised the same allegations as the previous applications, namely, that both children were denied proper care and attention and were permitted to live under conditions

---

[2] The children's biological father is not a party to this appeal.

injurious to their well-being. The court granted the orders, and each child was committed to the custody of the petitioner. In addition, the court issued to the respondent specific steps for rehabilitation in an effort to assist her reunification with the children. In March, 2007, both children were placed in the same foster home.[3]

On May 10, 2007, the court granted the petitioner's permanency plan for each child for reunification with the respondent. On February 6, 2008, the petitioner filed a permanency plan for each child to terminate the parental rights of the respondent regarding both children. On June 6, 2008, the petitioner filed petitions seeking to terminate the parental rights of the respondent and the children's father. The petitioner alleged that, in a prior proceeding, both children had been found to have been neglected or uncared for and that the parents had failed to achieve such a degree of personal rehabilitation as would encourage the belief that, within a reasonable time, considering the ages and needs of the children, each parent could assume a responsible position in the life of each child. On October 8, 2009, trial on the petitions commenced.[4]

In the adjudicatory phase of the proceedings, the court found by clear and convincing evidence that the respondent had failed to rehabilitate as of the trial date and that "it is not foreseeable that she will rehabilitate within a reasonable period of time so that she could achieve a responsible position in the life of either Jacqueline or Rafael."

---

[3] In November, 2008, Rafael was placed with a different foster family. At the time of trial, the children lived in separate foster homes.

[4] Prior to trial, the respondent father signed a form consenting to the termination of his parental rights regarding Rafael and the petitioner withdrew its petition to terminate his parental rights with regard to Jacqueline. Therefore, trial was confined to the petitions to terminate the respondent mother's parental rights.

In the dispositional phase of the proceedings, the court considered and made written findings regarding the seven factors listed in General Statutes § 17a-112 (k).[5] The court determined that the department of children and families (department) had offered numerous services to the respondent in order to facilitate her reunification with her children. The court further determined that the respondent had failed to attend the great majority of those services and that she "has failed to recognize her substance abuse problem, has not addressed her mental health issues, has learned nothing about domestic violence and has had, and continued to have, contact with the man who physically and sexually abused her and her children."[6] The court determined

[5] General Statutes § 17a-112 (k) provides in relevant part: "[I]n determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

[6] The court specifically was concerned with the respondent's continuing contact with the father: "[The respondent] continues to have contact with

that the respondent had "made little, if any, adjustment in her circumstances, conduct or conditions to make it in the best interest of either Jacqueline or Rafael to return to her home in the foreseeable future." The court then determined, by clear and convincing evidence, that it was in the best interests of the children that the respondent's parental rights be terminated. This appeal followed.

"Our standard of review on appeal from a termination of parental rights is whether the challenged findings are clearly erroneous. . . . The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling. . . .

"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . In the adjudicatory phase, the trial court determines whether one of the statutory grounds for termination of parental rights [under § 17a-112 (j)] exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional

the man who abused her and her children and has asked Jacqueline to lie about this contact. . . . What is equally as troubling is the fact that the respondent mother knows that Jacqueline and Rafael are afraid of [him], obviously with good cause." (Citations omitted.)

phase, the trial court determines whether termination is in the best interests of the child." (Internal quotation marks omitted.) *In re Brea B.*, 75 Conn. App. 466, 469–70, 816 A.2d 707 (2003).

"The best interests of the child include the child's interests in sustained growth, development, well-being, and continuity and stability of its environment. . . . In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision, the court is mandated to consider and make written findings regarding seven factors delineated in [§ 17a-112 (k)].'"[7] (Citation omitted; internal quotation marks omitted.) *In re Ryan R.*, 102 Conn. App. 608, 625–26, 926 A.2d 690, cert. denied, 284 Conn. 923, 924, 933 A.2d 724 (2007). We note that those "seven factors serve simply as guidelines for the court and are not statutory prerequisites that need to be proven before termination can be ordered. . . . There is no requirement that each factor be proven by clear and convincing evidence." (Citation omitted.) *In re Victoria B.*, 79 Conn. App. 245, 261, 829 A.2d 855 (2003).

Furthermore, termination of parental rights litigation, including the present case, often involves testimony from various child welfare professionals. "The testimony of professionals is given great weight in parental termination proceedings. . . . It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to

---

[7] See footnote 5 of this opinion.

be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Citations omitted; internal quotation marks omitted.) *In re Carissa K.*, 55 Conn. App. 768, 781–82, 740 A.2d 896 (1999).

On appeal, the respondent claims that the court improperly concluded that termination of her parental rights was in the best interests of the children. In support of her claim, she argues that (1) termination did not serve her children's best interests because they maintained a loving bond with her and they did not want her parental rights terminated; (2) termination did not serve Jacqueline's best interest because the response by the petitioner's expert witness to a hypothetical question was equivocal as to whether termination necessarily served Jacqueline's best interest; and (3) termination did not serve Jacqueline's best interest because Jacqueline had no identified preadoptive family at the time of trial. We disagree with the respondent's arguments and conclude that the court, in finding that termination of the respondent's parental rights was in the best interests of Jacqueline and Rafael, properly considered the statutory factors set forth in § 17a-112 (k) and issued findings that are neither clearly erroneous nor contrary to the law.

I

The respondent first argues that termination of her parental rights did not serve the best interests of her children because her children maintained a loving bond with her and did not want her parental rights terminated. Although the respondent claims that the evidence adduced at trial revealed that she and the children

have a strong bond, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006); see, e.g., *In re Tyqwane V.*, 85 Conn. App. 528, 536, 857 A.2d 963 (2004); *In re Ashley S.*, 61 Conn. App. 658, 667, 769 A.2d 718, cert. denied, 255 Conn. 950, 769 A.2d 61 (2001); *In re Quanitra M.*, 60 Conn. App. 96, 106, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). Although the court did find that both children had a loving bond with the respondent, the court's analysis thoroughly addressed the respondent's inability to provide a stable home for her children, as reflected by the court's finding that she had failed to address the issues that had prevented her from being an effective parent, namely, substance abuse, mental health issues and domestic violence issues. The court concluded that "the bond between [the respondent] and her children does not negate that . . . viewed in the totality of the circumstances, it is in the best interest of each child to terminate [the respondent's] parental rights. . . . Only terminating the parental rights of the respondent mother can put these children on the road to the stability that they crave and deserve." Accordingly, because the court's findings and conclusions are supported by the evidence, we decline to disturb them on this basis.[8]

---

[8] We emphasize here that, in determining whether termination of a parent's rights is in a child's best interest, the court considers as one of seven factors "the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties . . . ." General Statutes § 17a-112 (k) (4). The court carefully considered the children's interest in maintaining a relationship with the respondent before concluding that termination of the respondent's rights was in their best interests. The respondent argues that termination of her rights is adverse to her children's interest in maintaining a relationship with her and, therefore, that it was not in their best interests. Specifically, she contends that termination effectively

## II

The respondent next argues that the termination did not serve Jacqueline's best interest because the response to a hypothetical question by the petitioner's expert witness was equivocal as to whether termination necessarily served Jacqueline's best interest. At trial, the petitioner called to the witness stand Bruce Freedman, a licensed psychologist with expertise in the area of child custody evaluation. Prior to trial, Freedman had created a report based on his psychological evaluations of the respondent and her children. The report included his opinion regarding whether termination of the respondent's parental rights would serve the children's best interests. In the report, Freedman opined that "[f]or [Jacqueline], termination of parental rights would be clearly in her best interests." On cross-examination, counsel for the children posed to Freedman a hypothetical question and asked whether, based on the hypothetical, he would change his opinion regarding Jacqueline's best interest:

"[Counsel for the Minor Children]: And I want you to assume for a minute, I'm going to ask you a hypothetical. Since the time of your report, I want you to assume that it's now been disclosed that the current foster placement that . . . Jacqueline's in, does not want to adopt her, has expressed no interest in adopting her, they will keep her there long-term but not . . . adopt,

---

would cut off any mechanism by which she could ensure contact with her children. Although we agree that termination would affect adversely her *legal* relationship with her children; see, e.g., *In re Barbara J.*, 215 Conn. 31, 44, 574 A.2d 203 (1990) (termination involves "the complete severance . . . of the legal relationship, with all its rights and responsibilities, between the child and his parent" [internal quotation marks omitted]); there is no evidence in the record to suggest that termination of her rights would preclude the maintenance of a familial or nonlegal relationship between the respondent and her children, or that contact between the children and the respondent would not be permitted, fostered or encouraged by the children's caretakers.

that there's a recent relative placement resource that's come forward; however, Jacqueline's total contact with this placement resource at this point has been two or three visits for one day. I also want you to assume that Jacqueline's visited with [the respondent] on a weekly basis, that Jacqueline has expressed to her [department] worker as well as to her attorney that she does not want to see [the respondent's] parental rights terminated and that she'd like to live with either [the respondent] or this other relative resource.

"And finally, I would like you to assume that Jacqueline's expressed that the most important thing for her is to continue to have contact with [the respondent], regardless of where she ends up living, she wants to continue to have contact with [the respondent]. Keeping all that in mind, does that change your opinion in regards to your response to the question that was asked of you back in January, 2009, to actually provide an opinion regarding placement of these children with permanency in mind in which you responded that for [Jacqueline], termination of parental rights would clearly be in her best interest?"

Freedman responded that "[t]he important element, whether it's through *termination or a long-term foster care*, is that there's got to be some adult who has enough authority to help guide her when, you know, visits are constructive and they're helping her and not hurting her and when she needs to take a break from it." (Emphasis added.) The respondent argues that, because Freedman's response was equivocal as to whether termination necessarily served Jacqueline's best interest, the court did not have clear and convincing evidence to support its finding that termination of her parental rights would serve Jacqueline's best interest.

"Although we often consider the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to

the child's best interest." (Citations omitted; internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 398, 852 A.2d 643 (2004). Regardless of whether Freedman's response to the hypothetical question was equivocal, our review of the record reveals that there was clear and convincing evidence, in the form of exhibits and testimony, that supported the court's finding that termination of the respondent's parental rights would serve Jacqueline's best interest. Accordingly, we decline to disturb the court's finding.

### III

The respondent finally argues that her parental rights with regard to Jacqueline should not have been terminated because Jacqueline had no identified preadoptive family at the time of trial.[9] Although the court found that Jacqueline had no identified preadoptive family, "the law does not preclude the termination of a biological parent's rights simply because adoption of the child by new parents is not imminent. Although subsequent adoption is the preferred outcome for a child whose biological parents have had their rights terminated . . . it is not a necessary prerequisite for the termination of parental rights. While long-term stability is critical to a child's future health and development . . . adoption provides only one option for obtaining such stability." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 492, 940 A.2d 733 (2008). "Termination of a biological parent's rights, by preventing further litigation with that parent, can preserve the stability a child has acquired in a successful

---

[9] The respondent does not make this argument concerning termination of her rights with regard to Rafael. We note that the court found that, at the time of trial, Rafael was well settled in a preadoptive home and that his foster mother was "an ideal adoptive parent." Indeed, his foster mother testified that she was willing to provide him a permanent home and to adopt him. Therefore, our analysis of this argument is confined to termination of the respondent's rights as they pertain to Jacqueline.

foster placement and, furthermore, move the child closer toward securing permanence by removing barriers to adoption. . . . Even if no adoption is forthcoming, termination can aid stability and lessen disruption because a parent whose rights have been terminated no longer may file a motion to revoke the commitment of the child to the custody of the commissioner . . . or oppose an annual permanency plan." (Citations omitted.) Id., 495–96.

Jenny Johnson, the department social worker assigned to this case, testified that, despite the unwillingness of Jacqueline's foster mother to adopt Jacqueline, the foster mother had indicated that she would provide Jacqueline with long-term foster care. Additionally, Freedman opined in his report that "[Jacqueline] should remain with [her foster mother], who had shown a highly commendable commitment to [Jacqueline] during her extended period of residential treatment." Furthermore, the department was in the process of investigating Jacqueline's half-brother as a long-term placement resource. The court found that, at the time of trial, her half-brother had met every department requirement and that Jacqueline wanted to live with and be adopted by him if the respondent's parental rights were terminated. In light of this evidence, the trial court reasonably could have concluded that the possibility of a permanent placement for Jacqueline with either her current foster mother or with her half-brother was preferable to the continuing uncertainty of the status quo.

In light of the foregoing, we conclude that it was not clearly erroneous for the court to have found that it was in the best interests of the children to terminate the parental rights of the respondent.

The judgments are affirmed.

In this opinion the other judges concurred.