******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE SANTIAGO G.*
(AC 36852)

DiPentima, C. J., and Alvord and Bear, Js.

*Argued October 29, 2014—officially released January 6, 2015***

(Appeal from Superior Court, judicial district of
Stamford, Juvenile Matters, Heller, J. [neglect
adjudication]; Hon. A. William Mottolese, judge trial
referee [motion to revoke; motion to open].)

*Elizabeth K. Adams*, for the appellant (respondent
mother).

*Michael Besso*, assistant attorney general, with whom
were *Lorri Kirk*, assistant attorney general, and, on the
brief, *George Jepsen*, attorney general, and *Gregory T.
D'Auria*, solicitor general, for the appellee (petitioner).

*Joshua Michtom*, assistant public defender, for the
minor child.

*Opinion*

DiPENTIMA, C. J. In this uniquely unfortunate case, the respondent mother, Melissa M.,[1] appeals from the judgment of the trial court denying her motion to revoke the commitment of her minor child, Santiago G. (child), and transfer custody and guardianship to a third person, Maria G., who had cared for the child for the first three years of his life. Specifically, she argues that the court improperly (1) considered the best interests of the child even though the original cause for commitment never had existed, (2) found that it was in his best interests to remain with his foster family,[2] and (3) denied her motion to open on the basis of newly discovered evidence. The petitioner, the Commissioner of Children and Families (commissioner), also advocates that the child should be returned to the custody and guardianship of Maria G. The child, through his attorney, and the guardian ad litem, Attorney Brian D. Kaschel,[3] disagree and counter that the court properly considered and weighed the best interests of the child in declining to remove him from his foster family. We affirm the judgment of the trial court.

The unique circumstances of this case require a detailed recitation of the facts. On October 10, 2012, the child, then age three, was taken into the care and custody of the commissioner pursuant to a ninety-six hour hold. The child was returned to Maria G. the next day after the court, *Hon. A. William Mottolese*, judge trial referee, denied the ex parte motion filed by the commissioner for an order of temporary custody. Judge White denied a second ex parte motion for an order of temporary custody on October 12, 2012. On October 16, 2012, the commissioner filed for a third ex parte motion for an order of temporary custody on the basis of the same facts. Specifically, the commissioner alleged that the Department of Children and Families (department) had received a report from the United States Department of Homeland Security that Maria G. and her husband possibly had purchased a child in Guatemala and smuggled him into the United States on June 14, 2009.[4] This report also contained an allegation that Maria G. had been physically aggressive with the child.

During an investigation by the department, Maria G. stated that the mother of her former housekeeper alerted her to a pregnant fourteen year old orphan in Guatemala, later identified as the respondent, who wanted to place her newborn baby. Maria G. admitted to travelling to Guatemala, paying a physician to deliver the baby and contacting a midwife to falsify information so that she was listed as the biological mother. Maria G. acknowledged using this false information to obtain a birth certificate for the child that named her and her husband as the biological parents. Last, Maria G. told the investigator that she had used the false passport to

facilitate the return to the United States with her husband and the child.

On October 16, 2012, Judge Heller, finding that the child was in immediate physical danger from his surroundings, entered an order vesting the temporary care and custody of him in the commissioner and scheduled a subsequent hearing. The court sustained the order of temporary custody after a hearing on October 25, 2012. On November 15, 2012, the court adjudicated the child neglected on the basis that he had been abandoned by his biological parents, who were unknown at the time of the hearing. At a hearing on December 6, 2012, the assistant attorney general representing the department informed the court that Maria G. had provided him with the identity of the respondent and that the department was in the process of verifying that she was the biological mother of the child. On January 24, 2013, the court rendered a default judgment against the biological father for failing to appear in the proceedings. On February 14, 2013, the commissioner objected to Maria G. being granted intervenor status and, thereafter, the court denied her motion to intervene.

At a hearing on June 6, 2013, counsel for the respondent was present for the first time and the court appointed Kaschel as guardian ad litem for the child. Additionally, on that date the court received evidence that the respondent was the biological mother of the child.[5] On June 28, 2013, the commissioner reversed her position on Maria G. being granted intervenor status after confirming that the respondent was the biological mother who wanted Maria G. to raise the child.

On September 12, 2013, the department presented a permanency plan seeking a transfer of guardianship to Maria G. and a concurrent termination of parental rights and adoption by Maria G. The alternative plan was a termination of the respondent's parental rights and adoption by the foster parents, who had been caring for the child since December, 2012. On October 22, 2013, the respondent filed a motion captioned "Motion to Revoke Commitment." She alleged that the cause for commitment of the child no longer existed and that custody and guardianship of the child should be transferred to Maria G. in accordance with the respondent's wishes. Approximately two months later, the commissioner filed a motion to open and set aside the judgment adjudicating the child neglected on the basis of mutual mistake. Specifically, the commissioner argued that the parties had been mistaken in the belief that the identity of the biological parents was unknown at the time of the commitment, and that the child was the victim of human trafficking. The commissioner asserted that it was in the best interests of the child for the court to open the adjudication of neglect and to set aside the November 15, 2012 order of commitment.[6]

Starting on January 16, 2014, and continuing for

almost four months over divers dates, the court, *Hon. A. William Mottolese*, judge trial referee, held a hearing on the motions filed by the respondent and the commissioner. Marta Saavedra, a member of the department's intake unit, testified that on September 18, 2012, she had received a referral from the United States Department of Homeland Security alleging that Maria G. and her husband participated in human trafficking and physically abused the child. The basis of this information was an anonymous tip. During her interview with Saavedra, Maria G. lied and stated she did not have any complications during her pregnancy with the child. Maria also stated that she and her husband were the biological parents of the child. Maria G. later revealed the truth of how she had learned of the respondent's plight and eventually brought the child to the United States.

Maria G. herself testified that a family friend needed a place to live and she permitted him to sleep in the basement for a few days. She believed that this individual was the person responsible for contacting the United States Department of Homeland Security after she requested that he move out.[7] Maria G. also testified that she had pleaded guilty to a federal felony[8] and as part of her plea she agreed to leave the United States and return to Argentina. She planned to take the child with her and live with her family.

After hearing from other witnesses, the court issued an oral decision at the conclusion of the hearing. The court first determined that the grounds for the commitment no longer existed. It then turned to the issue of whether the revocation of the commitment was in the best interests of the child. "The court believes that the burden of proof has been sustained and that the motion to revoke the commitment should be denied. . . . Now, my concerns are, and the reason that I believe that it is in this child's best interests that he remain with [his foster parents] are: First, that a removal from his present environment would be so harmfully traumatic to him that he would suffer far greater from that trauma than he would suffer from any predictable, perceivable harm that he will suffer in later life, whether that's when he reaches middle school age, at age ten, whether he reaches what I always say is the toughest age for an adolescent, and that's age fourteen, or whether it doesn't hit him until he's an adult, all of that to me, the likelihood of that happening, which is not certain, it's not inevitably predictable. And I don't think I even heard it stated from an expert within a reasonable degree of probability, but I am going to assume that there is a distinct possibility that it will occur. That harm does not outweigh the harm that I think will occur to him from the removal. . . .

"But it's clear to me that from his use of the term, I have two mommies, that the description that Dr. [David]

Mantell gave today is accurate. And that is that there are two primary attachments here. . . . Now, whether the attachment with [Maria G.] will ever be rekindled or renewed, it certainly will never reach the same level that it had, that it did in the past. There's no question about that.

"So [Maria G.'s] stature as a primary attachment will gradually diminish, and she will become a secondary attachment, if—if even, if even that. And the [foster family] will be become a stronger primary attachment. And it's clear to me from all the testimony from the school people, from the therapist, that [the child] is thriving in this environment, and that he will continue to thrive. And it's not just a question of making him happy, it's not just a question of doing what he requests that we do, of catering to his whims and desires. After all . . . he's certainly not capable of making any kind of a rational or mature judgment. But nevertheless, I agree with the guardian ad litem that is, it is clearly in his best interests that he continue to grow up in that environment. . . . I mean, I have—I have a vision in my mind of the kid, child being removed bodily, kicking and screaming, and being taken out to visit [Maria G.] because he's learned that he's going to be going back to [Maria G.] I can't assess the damage that would be caused to him for that.

"Next, in trying to determine what reunification would be like with Maria G., I see, of course, a trip to Argentina, and the establishment of the home in Argentina, the development of relationships with family and extended family, the making of new friends. I'm going to presume that all of that is—is going to go— would go smoothly, and would benefit him. But what I don't know is what's the rest of the environment look like down there?

"There may be psychological, psychologists, therapists. I don't know that their level of competence is. I don't know whether they're equipped, trained to deal with this—this particular issue that this child faces, which rarely occurs in the experience of any psychologist. I don't know what kind of schools there are in Argentina. I don't know what the community consists of down there, whether it's appropriate for him or not. . . . So these—these are the concerns that I have. And these are the reasons why I don't think reunification with Maria G. is in his best interests. And that remaining with the [foster family] is indeed in his best interests."

On April 28, 2014, the commissioner filed a motion for reconsideration. On May 6, 2014, the commissioner filed a motion to open the judgment and introduce newly discovered evidence, which the respondent subsequently joined. The commissioner argued that Maria G. would not be sentenced in her federal criminal case until August, 2014, at the earliest, and therefore there would be time to reintroduce the child to her before

she was to return to Argentina. The court denied the motions to open and the relief requested in the motion for reconsideration, and this appeal followed.[9]

I

The respondent first claims that the court improperly considered the best interests of the child even though the original cause for commitment never had existed. Specifically, she argues that General Statutes § 46b-129 (m)[10] does not "contemplate that the court conduct a best interests analysis where no cause for commitment existed in the first place." We conclude that the parties and the court proceeded under the incorrect subsection of § 46b-129; nevertheless, the court properly considered the best interests of the child in resolving the respondent's dispositional motion to transfer guardianship to Maria G.[11]

The case of *In re Avirex R.*, 151 Conn. App. 820, 96 A.3d 662 (2014), is the appropriate starting point for our analysis. In that case, the respondent mother appealed from the judgment of the trial court transferring guardianship of her minor child from the commissioner to his paternal aunt.[12] Id., 821–22. The child had been born with opiates in his system. Id., 822. The commissioner placed a ninety-six hour hold on him, filed a neglect petition and moved for an order of temporary custody. Id. The court granted the ex parte motion for an order of temporary custody and the commissioner placed the child with his paternal aunt following his release from the hospital. Id., 823.

The respondent in that case pleaded nolo contendere to the neglect petition, but contested the disposition of commitment. Id., 823. She also filed a motion for transfer of guardianship seeking to have the child placed with his maternal grandmother. Id. The court denied this motion. Id. Approximately three months later, the commissioner sought to revoke the commitment and transfer guardianship to the paternal aunt. Id., 824. The respondent filed an objection to the proposed transfer of guardianship, and to have the court order a reunification plan with her. Id., 824–25.

The court granted the commissioner's motion and referred to § 46b-129 (m) as the applicable law. Id., 825. Specifically, the court found that the cause for commitment no longer existed because it was no longer in the child's best interests to continue with the commitment. Id., 826. It further found that placement with the paternal aunt was in the child's best interests, rather than placement and reunification with the respondent. Id., 826–27.

On appeal, the respondent argued that the court had misapplied § 46b-129 (m) by failing to make the required finding that the cause for commitment no longer existed and by failing to apply the required presumption of fitness contained in that particular subsection of § 46b-

129. Id., 827. We determined that the court improperly used subsection (m) because the commissioner had not sought to return the child to the respondent, but instead had sought to transfer guardianship to a third party. Id., 827–28. "That procedure is properly governed by subjection (j) of § 46b-129." Id., 828. We also determined that because the court had engaged in the analysis required by § 46b-129 (j),[13] the judgment did not need to be reversed. Id.

In setting forth the rationale for our decision, we first noted that resolution of the appeal required a harmonization of the subsections of § 46b-129 and certain rules of practice, including Practice Book §§ 35a-16, 35a-12A and 35a-20. *In re Avirex R.*, supra, 151 Conn. App. 828. We also observed that a court looks to the substance of a motion filed to determine which statute applies. Id., 830. We stated that "the only issue before the court in this case was whether guardianship of Avirex should be transferred to his paternal aunt." Id., 831.

We then explained the distinction between the two subsections of § 46-129. "An obvious difference between these two subsections is that subsection (j) contains specific language referencing a transfer of guardianship to a party other than the child's or youth's parent or former legal guardian and sets forth a presumption as to the individuals, such as other relatives, who should then be given custody, while subsection (m) makes no mention of any individual other than the [commissioner], a parent or the child's attorney. Instead, subsection (m) is focused only on whether the child's or youth's commitment should be revoked without reference to a transfer of guardianship to a party other than the parent or former guardian. As a matter of logic, if the child's or youth's commitment to the [commissioner] is revoked by the court without a concomitant transfer of guardianship to a third party, then the child must be reunified with the parent or former legal guardian (with or without protective supervision) as contemplated by the permanency plan option set forth in § 46b-129 (k) (2) (A) ('revocation of commitment and reunification of the child or youth with the parent or guardian').

"*Accordingly, we conclude that the legislature intended that a motion, like the one filed here by the* [*commissioner*], *seeking to transfer guardianship of a child or youth from the* [*commissioner*] *to an individual other than the parent or former guardian, should be adjudicated by the court pursuant to subsection (j) of § 46b-129.* This conclusion is buttressed by reference to Practice Book § 35a-16, which provides in relevant part that '[u]nless filed by the commissioner of the department of children and families, any modification motion to return a child or youth to the custody of the parent without protective supervision shall be treated as a motion for revocation of commitment.'"

(Emphasis added; footnotes omitted.) *In re Avirex R.*, supra, 151 Conn. App. 832–33; see also *In re A.R.*, 123 Conn. App. 336, 338–39, 1 A.3d 1184 (2010); cf. *In re Marcus S.*, 120 Conn. App. 745, 753–54, 994 A.2d 253 (court used § 46b-129 [m] where parent sought transfer of guardianship from commissioner to himself), cert. denied, 297 Conn. 914, 995 A.2d 955 (2010).

We set forth the applicable test for granting a motion to transfer guardianship under § 46a-129 (j). "[T]he court must first determine whether it would be in the best interest of the child for guardianship to be transferred from the [commissioner] to the proposed guardian. See also Practice Book § 35a-12A . . . . In considering what is in the best interest of the child, subsection (j) creates a rebuttable presumption that if the proposed guardian is a member of one of the enumerated group of relatives or caregivers, such a transfer is in the child's best interest. . . . Subsection (j) (3) of § 46b-129 also provides a rebuttable presumption that if the proposed guardian is a relative of the child, and is either licensed by the department as a foster parent, or has temporary custody of the child when the motion to transfer guardianship is heard by the court, such a relative is presumed to be a suitable and worthy person to assume legal guardianship." (Citations omitted.) *In re Avirex R.*, supra, 151 Conn. App. 834–35. Finally, we determined that "*a motion to transfer guardianship is simply dispositional in nature, and does not require the court to review the underlying cause for commitment*, which has already been judicially determined during an earlier phase of the proceeding." (Emphasis added.) Id., 835.

The reasoning of *In re Avirex R.* applies to the present case. The October 22, 2013 motion filed by the respondent, although captioned as a "Motion to Revoke Commitment," sought an order transferring custody and guardianship of the child to Maria G., a third party who does not fall within the ambit of § 46b-129 (m). "The label on the motion, however, does not control our analysis. We must look to the substance of the relief sought by the motion rather than its form because [t]o hold [a litigant] strictly to the label on his filing would exalt form over substance." (Internal quotation marks omitted.) *In re Cameron C.*, 103 Conn. App. 746, 751, 930 A.2d 826 (2007), cert. denied, 285 Conn. 906, 942 A.2d 414 (2008); see also *In re Avirex R.*, supra, 151 Conn. App. 830. As a result, the court should have treated this as a motion to transfer guardianship filed pursuant to subsection (j) of § 46b-129. See *In re Avirex R.*, supra, 833. As such, it was dispositional in nature and subject to a best interests analysis.[14] Id., 834; *In re Averiella P.*, 146 Conn. App. 800, 804, 81 A.3d 272 (2013); *In re A.R.*, supra, 123 Conn. App. 341; see also Practice Book § 35a-12A.

The respondent's appellate argument that the adjudi-

cation must be vacated and that the child must be returned to Maria G. because the cause for commitment never existed in the first place is premised on the use of § 46b-129 (m). Because we have concluded that it was error, albeit harmless, for the court to use that subsection, this argument fails. As noted in *In re Avirex R.*, supra, 151 Conn. App. 834: "In order to properly grant a motion to transfer guardianship . . . the court must first determine whether it would be in the best interest of the child for guardianship to be transferred from the [commissioner] to the proposed guardian." Because the court conducted a best interests analysis as required by § 46b-129 (j), we conclude that the respondent's statutory argument must fail.

II

The respondent next claims that the court's best interests finding was clearly erroneous. Specifically, she argues that the court improperly credited the conclusions of David Mantell, a clinical psychologist. We conclude that the court's best interests finding was supported in the record, and therefore, was not clearly erroneous.

The following additional facts are necessary for our discussion. The respondent called Rodolfo Rosado, a psychologist, as an expert witness. Rosado had evaluated both the child and Maria G. He subsequently spoke with the foster parents. As to Maria G., he testified that she was upset with the circumstances and "extremely motivated" to regain custody. Testing revealed no significant indications of any antisocial types of behavior or any indications of substance abuse or mental illness. Rosado described her as "fundamentally a loving, caring, attentive parent." Rosado evaluated the child during June and July, 2013, and described him as having some trouble sitting still and focusing and that these aspects suggest the eventual emergence of either severe anxiety or attention deficit disorder. Rosado testified that the child had increased indications of being restless, impulsive and emotionally labile, or having a tendency to overreact to situations. The child identified himself with the surname of the foster parents, who Rosado described as "naturally affectionate, intelligent, caring, decent, good people . . . ."

During one test, Rosado asked the child to make up stories based on various cards. Rosado explained that his stories lacked heroic figures, indicating that he looked "at the world as confused . . . [where] terrible things can happen in your life with absolutely no explanation and there is no one to provide protection or security against those dangerous, ominous forces." Rosado expressed concerns that taking the child from his first parental figure, Maria G., without warning or explanation "broke" him and that this psychological injury would remain and present a problem later in life.[15] Rosado indicated, however, that the child appeared to

have numerous strengths and that with the support of others, he expected him to "do generally well."

Rosado also explained that the child needed a narrative, which he lacked, to understand what had happened to him and to complete his sense of identity. Absent this narrative to heal the damage to his sense of identity, Rosado feared that a tragedy involving the child would occur one day in the future.

Rosado recommended that the child be placed in the care of Maria G., even if she left the United States for Argentina. Acknowledging the negative impact on both the foster family and the child, Rosado opined that he would be surrounded by extended family and there was "a fair prognosis of being in an environment where he will be loved and healed and given an explanation of everything that went on in the first five years of his life that make sense to him."

Mantell testified as an expert called by the attorney for the child. He had evaluated the child on two occasions in December, 2013. The child presented as a "[s]uper high-charged little boy, just lovely, sociable, friendly, responsive, interested, alert, verbal." Mantell described the interactions between the child and the foster parents that he witnessed as "[v]ery natural, warm, mutually interested reactions. The whole time they—it looked like a natural and very close parenting-child set of relationships. Moved easily between parent to parent, lots of spontaneous expression of affection that he initiated to both of them for touch contact, and hugs, and smiles, and touches of many kinds, and which he received similarly. And also, a great deal of laughter as they played word games, and invented other things to keep themselves busy with the toys and equipment in the office." The child identified the foster family as his family. He also showed a "great deal of mutual knowledge and affection" with his foster brother, who was one year older. In short, Mantell opined that the foster family was the child's psychological family.[16]

Given the child's prior experiences of being separated from Maria G.'s husband, then from Maria G., followed by an unsuccessful and upsetting first foster care placement, Mantell stated that he had been compromised developmentally and considered him to be an already vulnerable child who also had some temperamental characteristics that placed him at risk for attention deficit disorder. As a result, Mantell indicated that the child would not be able to understand and successfully integrate the loss of his foster family. He further explained that these types of losses have a cumulative effect, and therefore the greater the number of losses, the greater the deficits in the future. Additionally, Mantell expected that impact of the prior losses of Maria G.'s husband, and then Maria G. herself to lessen for the child due to his age when those events had occurred.[17] Mantell also explained that while the child had two primary

attachments, his attachment to Maria G. would decrease in significance over time.

Mantell agreed that a narrative would be beneficial to the child and stated that one should be provided to him at age ten. He noted that a narrative was being developed with the foster family as evidenced by their celebration of his one year anniversary with them in December, 2013. The child, as he grew older, would seek for a more advanced cognitive narrative to explain the events, but he likely had overcome a substantial portion of the emotional trauma of the removal from Maria G. Specifically, he stated: "I think he has already done the emotional work of processing that loss. I think that that wound is already substantially healed. I think he has already moved on significantly. And in his emotional world, left that prior world behind. . . . I think [that losing his world with the foster family] will be a devastating impact. I don't—I don't know how he will deal with that." Mantell later clarified that, in his opinion, this devastation would have a long lasting effect on the child. Last, he stated that he did not know of any way that returning the child back to Maria G. would be better for him.

The respondent presented Ilene Grueneberg, a psychologist, as an expert and rebuttal witness. In preparation for her testimony, she reviewed the reports filed by both Rosado and Mantell, as well as their testimony in this case. She observed that Rosado and Mantell differed as to their descriptions of whether the child had a primary attachment to Maria G. and the impact of removing him from his foster family's home. Grueneberg opined that returning the child to Maria G. would allow him "to heal and understand, and hopefully integrate some of the events that have occurred in a more positive way." She concluded that placing the child with Maria G. was "really the primary and perhaps the only way to—for him to resolve what has occurred, given that he has that opportunity. . . . In this case, he has the opportunity to heal that wound, to have some other narrative for what's happened to him. The absence of narrative is very damaging. So it allows him not only to know that, but to repair that with her."

We note that: "Questions of custodial placement generally are resolved by a factbound determination of what is in the best interest of the child . . . as shown by a fair preponderance of the evidence. . . . To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [his] environment. . . . We have stated that when making the determination of what is in the best interest of the child, [t]he authority to exercise the judicial discretion under the circumstances revealed by the finding is not conferred upon this court,

but upon the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . Nothing short of a conviction that the action of the trial court is one which discloses a clear abuse of discretion can warrant our interference. . . . [G]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . [Appellate courts] are not in a position to second guess the opinions of witnesses, professional or otherwise, nor the observations and conclusions of the [trial court] when they are based on reliable evidence." (Internal quotation marks omitted.) *In re Sena W.*, 147 Conn. App. 435, 447–48, 82 A.3d 684 (2013); see also *In re Anthony A.*, 112 Conn. App. 643, 653–54, 963 A.2d 1057 (2009).

The respondent specifically argues that the court's findings based on Mantell's testimony were clearly erroneous and that instead the court should have credited the expert testimony from Rosado and Grueneberg. "We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached . . . nor do we retry the case or pass upon the credibility of the witnesses. . . . The determinations reached by the trial court . . . will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous." (Internal quotation marks omitted.) *In re Cameron C.*, supra, 103 Conn. App. 757.[18]

The respondent challenges the court's reliance on Mantell's opinion that the child formed a second primary attachment to the foster mother and removal from that home would cause greater harm than ending his relationship with Maria G. She further points to the testimony of Rosado and Grueneberg as more persuasive. Acceptance of this argument, however, would be contrary to our case law. "It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of the witnesses. . . . It is the quintessential function of the fact finder to reject or accept certain evidence, and to believe or disbelieve any expert testimony. . . . The trier may accept or reject, in whole or in part, the testimony of an expert offered by one party or the other." (Internal quotation marks omitted.) *In re Rafael S.*, 125 Conn. App. 605, 611–12, 9 A.3d 417 (2010); see also *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 668, 420 A.2d 875 (1979) (psychological testimony from professionals is rightly accorded great weight and appellate courts not in position to second-guess opinions of expert witness).

The court, in making the best interests determination,[19] was free to credit the testimony and opinion of Mantell over Rosado and Grueneberg. See *In re Cesar G.*, 56 Conn. App. 289, 296–97, 742 A.2d 428 (2000). We disagree that the court's reliance on Mantell's position was clearly erroneous. Accordingly, the respondent's claim fails.

### III

The respondent next claims that the court improperly denied her motion to open on the basis of newly discovered evidence.[20] Specifically, she argues that once it became known that Maria G.'s sentencing in her federal criminal case would be postponed and thus a graduated, transitional return with the child would be possible, the court should have granted the motion to open the judgment. We disagree.

On May 6, 2014, the commissioner, pursuant to General Statutes § 52-212a,[21] filed a motion to open the judgment to allow the introduction of newly discovered evidence. In this motion, the commissioner argued that the decision was "made in significant part based on the evidence introduced at the time of trial that [Maria G.] was going to be sentenced in Federal Court on May 2, 2014, and would likely be deported to Argentina within several weeks after the sentencing." The department subsequently learned that the sentencing date had been continued until August, 2014, at the earliest. The commissioner further argued that this additional time would permit the child to return to the custody and care of Maria G. in a graduated, transitional manner. On May 22, 2014, the respondent joined the commissioner's motion.

The following facts are necessary for our discussion. On May 27, 2014, the court held a hearing on the motion to open. The assistant attorney general claimed that the court's decision was based in large part on the lack of time to introduce the child back into Maria G.'s life and that her sentencing had been "pushed off" until sometime after August.[22] The court then issued an oral decision denying the motion to open. It stated that the commissioner had taken a "subsidiary finding and made it the primary finding." In order words, the period of time before Maria G. would leave the United States was not the primary reason for the court's determination that the best interests of the child were to remain with the foster family. The court's decision set forth two primary reasons for denying the motion to transfer guardianship. First, the court found that the present harm of removing the child from the foster family outweighed any potential future harm. Second, the court had a significant lack of information regarding the psychological resources available to the child in Argentina.

"A court may grant a motion for a new proceeding based on newly discovered evidence if the movant establishes by a preponderance of the evidence, that:

(1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new [proceeding]; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new [proceeding]. . . . It is within the discretion of the trial court to determine, upon examination of all the evidence, whether the [movant] has established substantial grounds for a new [proceeding], and the judgment of the trial court will be set aside on appeal only if it reflects a clear abuse of discretion." (Internal quotation marks omitted.) *Grasso* v. *Grasso*, 153 Conn. App. 252, 265, 100 A.3d 996 (2014); see also *Worth* v. *Korta*, 132 Conn. App. 154, 160–61, 31 A.3d 804 (2011), cert. denied, 304 Conn. 905, 38 A.3d 1201 (2012).

The court did not abuse its discretion in denying the motion to open filed by the commissioner and joined by the respondent. It explained that the timing of Maria G.'s departure from the United States was not the primary focus of its best interests determination.[23] It is clear that the court concluded that the delay in sentencing would not have produced a different result in a new proceeding. This claim, therefore, fails.

As a final matter, we note the following statements made over the course of Rosado's testimony that compellingly summarized the unfortunate nature of this case. "My fear today is that we may have damaged [the child] deeply and almost irreparably. And not only the [child] but if you were to design a way to deeply damage two children and two families, you couldn't have done a better job than the way this situation has evolved. . . . [T]hese things happen to keep it going and substantiate it. [N]o matter what you do it is going to be damaging. . . . No matter what you do at this point very, very significant damage has been done . . . to [the child], to [Maria G.], to the current foster parents, and to their son . . . . The damage has been done by us collectively with the best of intentions."

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 6, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] We refer in this opinion to Melissa M. as the respondent.

[2] The foster family is comprised of a mother, father and a brother who is approximately one year older than the child.

[3] In accordance with Practice Book § 67-3, Kaschel, through his attorney, filed a letter adopting the position of the child in this appeal.

[4] Maria G. testified that she and her husband separated in February, 2012.

[5] In the June 6, 2013 hearing, the court noted that a February 28, 2013 hearing had been marked off and a hearing scheduled for May 6, 2013 was postponed as the DNA test results were pending. The DNA test results were received on May 30, 2013. It appears, therefore, that the department made diligent efforts to confirm that the respondent is the biological parent of the child. We also note that the respondent has been in Guatemala during

the entirety of these proceedings and never has been present in court.

[6] The court denied the commissioner's motion to open on April 22, 2014. On April 28, 2014, the commissioner moved for reconsideration. She argued that in October, 2012, "the parties were under the mistaken belief that the identities of the birth parents [were] unknown and could not be ascertained. This mistake was buttressed by the allegation of human trafficking. At the time those orders were entered, neither [the department] nor the child had any information related to the identity of the biological parents and the particular details about the custodial transfer. Only after the November 15, 2012 neglect adjudication and order of commitment did the identities of the parents become known to the parties. Subsequently, the [department] was able to verify that the [respondent] actively endorsed [Maria G.] as the de facto parent for her son and continues to want him placed in [Maria G.'s] physical custody."

The court granted the commissioner's motion for reconsideration but denied the relief requested. It determined that "[m]utual mistake, no matter how clear it is—and I don't think it's that clear here at all—does not trump best interests by any means. Mutual mistake is an equitable principle that allows for the court to work fairness, equity and justice. It would not be fair, equitable and just to take action that was inimitable to the best interests of the child. That's why that principle does not prevail here."

On August 21, 2014, this court ordered the department to file a brief presenting its position on the issue raised by the respondent. In its appellate brief, the department advocates for a departure from the abuse of discretion standard of review in favor of plenary review due to the unique circumstances of this case. The department further explains the mutual mistake as the "later-disproven concern about human trafficking and, in hindsight, the state's unnecessary and unfortunate intervention into the life of [Maria G.'s] family."

We do not depart from the abuse of discretion standard. "We do not undertake a plenary review of the merits of a decision of the trial court to grant or to deny a motion to open a judgment. . . . In an appeal from a denial of a motion to open a judgment, our review is limited to the issue of whether the trial court has acted unreasonably and in clear abuse of its discretion. . . . In determining whether the trial court abused its discretion, this court must make every reasonable presumption in favor of its action. . . . The manner in which [this] discretion is exercised will not be disturbed so long as the court could reasonably conclude as it did. . . . A court's determinations as to . . . whether there has been a mutual mistake are findings of fact that we will not disturb unless they are clearly erroneous." (Citation omitted; internal quotation marks omitted.) *Terry* v. *Terry*, 102 Conn. App. 215, 222–23, 925 A.2d 375, cert. denied, 284 Conn. 911, 931 A.2d 934 (2007). The court did not abuse its discretion by remaining focused on the best interests of the child. We also reject the respondent's appellate argument that the court erred in declining to consider the motion to open as a result of mutual mistake before undertaking a best interests analysis.

[7] There was evidence before the court that Maria G. had rejected the sexual advances of the family friend, and he had retaliated by reporting her to the authorities.

[8] The United States District Court for the District of Connecticut accepted the guilty plea of Maria G. on November 26, 2013. Specifically, she pleaded guilty to one count of conspiracy to unlawfully bring an alien child into the United States in violation of 8 U.S.C. § 1324 (a) (1) (A) (v) (I). As of October 29, 2014, the date of oral argument before this court, she had not been sentenced by the federal court.

[9] The attorney for the child argues that this appeal was not taken from a final judgment and not ripe, and therefore we lack subject matter jurisdiction to consider its merits. We disagree. The reasoning found in cases such as *In re Shamika F.*, 256 Conn. 383, 404–405, 773 A.2d 347 (2001), *Taff* v. *Bettcher*, 243 Conn. 380, 386–87, 703 A.2d 759 (1997), *Madigan* v. *Madigan*, 224 Conn. 749, 754–55, 620 A.2d 1276 (1993), and *In re Todd G.*, 49 Conn. App. 361, 363–65, 713 A.2d 1286 (1998), leads us to conclude that an immediate appeal is necessary to protect the rights attendant to the parent-child relationship in this case.

[10] General Statutes § 46b-129 (m) provides: "The commissioner, a parent or the child's attorney may file a motion to revoke a commitment and, upon finding that cause for commitment no longer exists, and that such revocation is in the best interests of such child or youth, the court make revoke the commitment of such child or youth. No such motion shall be filed more often than once every six months."

[11] The respondent also appears to contend that because there had not been a substantial showing at the temporary custody hearing that the child was in immediate physical danger, it was error to sustain the order of temporary custody. Counsel for the respondent made no effort to appeal from the order of temporary custody and we decline to consider an untimely challenge to that issue. See *In re Shamika F.*, 256 Conn. 383, 408, 773 A.2d 347 (2001).

[12] We acknowledge that the trial court did not have benefit of our decision in *In re Avirex R.*, supra, 151 Conn. App. 820, which was released on July 16, 2014.

[13] General Statutes § 46b-129 (j) (3) provides in relevant part: "If the court determines that the commitment should be revoked and the child's . . . legal guardianship . . . should vest in someone other than the respondent parent, parents or former guardian . . . there shall be a rebuttable presumption that an award of legal guardianship . . . upon revocation to . . . any relative who is licensed as a foster parent for such child or youth, or who is, pursuant to an order of the court, the temporary custodian of the child or youth at the time of the revocation . . . shall be in the best interests of the child or youth and that such relative is a suitable and worthy person to assume legal guardianship . . . . The presumption may be rebutted by a preponderance of the evidence that an award of legal guardianship to . . . such relative would not be in the child's . . . best interests and such relative is not a suitable and worthy person. . . ."

[14] "To determine whether a custodial placement is in the best interest of the child, the court uses its broad discretion to choose a place that will foster the child's interest in sustained growth, development, well-being, and in the continuity and stability of [his] environment." (Internal quotation marks omitted.) *In re Karl J.*, 110 Conn. App. 22, 26, 854 A.2d 231, cert. denied, 289 Conn. 954, 961 A.2d 420 (2008).

[15] During cross-examination, Rosado noted that the child also had sustained a significant psychological blow when Maria G. separated from her husband and the child did not have a full understanding of why the husband no longer was involved in his life.

[16] Mantell further expounded that the foster family "are the people who provide [the child] with his sense of identity and security. He sees his future with them. And I think it would be inexplicable for him if he were to be removed from that home, and I think that a removal would create a devastating, psychological, developmental crisis for him. And I think it would traumatize him very severely."

[17] Mantell noted that this concept of developmental amnesia would not apply if the court was to remove the child from the foster family because of his present age.

[18] Our opinion in *In re Cameron C.*, supra, 103 Conn. App. 757, an appeal from a revocation of the commitment of a child to the department and a reinstatement of guardianship in the father, referred to the clear and convincing standard of proof. Our Supreme Court subsequently clarified that the fair preponderance standard applies in temporary custody and neglect proceedings, including dispositional proceedings. *Fish* v. *Fish*, 285 Conn. 24, 73–74, 939 A.2d 1040 (2008); see also *In re Severina D.*, 137 Conn. App. 283, 293–94, 48 A.3d 86 (2012); *In re Kamari C-L.*, 122 Conn. App. 815, 824–25, 2 A.3d 13, cert. denied, 298 Conn. 927, 5 A.3d 487 (2010).

[19] "Although we often consider the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest." (Internal quotation marks omitted.) *In re Kyara H.*, 147 Conn. App. 829, 852, 83 A.3d 1249, cert. denied, 311 Conn. 923, 86 A.3d 466 (2014).

[20] The attorney for the minor child argues that the denial of the motion did not constitute a final judgment for purposes of appeal. We have stated that the denial of a motion to open the judgment is an appealable final judgment. See *Ryan* v. *Vera*, 135 Conn. App. 864, 868, 43 A.3d 221 (2012); *Mailly* v. *Mailly*, 13 Conn. App. 185, 188, 535 A.2d 385 (1988).

[21] General Statutes § 52-212a provides: "Unless otherwise provided by law and except in such cases in which the court has continuing jurisdiction, a civil judgment or decree rendered in the Superior Court may not be opened or set aside unless a motion to open or set aside is filed within four months following the date on which it was rendered or passed. The continuing jurisdiction conferred on the court in preadoptive proceedings pursuant to subsection (o) of section 17a-112 does not confer continuing jurisdiction on the court for purposes of reopening a judgment terminating parental rights. The parties may waive the provisions of this section or otherwise

submit to the jurisdiction of the court, provided the filing of an amended petition for termination of parental rights does not constitute a waiver of the provisions of this section or a submission to the jurisdiction of the court to reopen a judgment terminating parental rights."

[22] The assistant attorney general also sought to introduce additional evidence in the form of a home study conducted by the Argentinian Consulate of the home of Maria G.'s mother and the ability to obtain an Argentinian passport for the child. The latter documents were in Spanish without an English translation; accordingly, the court refused to consider them. The respondent did not challenge on appeal this aspect of the court's ruling on the motion to open.

[23] We also note that during the hearing on the motion for reconsideration, the court stated: "The primary reason was not because there was insufficient time to effectuate a gradual and meaningful reunification. The primary reason was that it was clearly, clearly in the court's mind in the child's best interests that he remain with the [foster family]."

---